NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0421n.06

No. 08-5626

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jul 13, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| KIMBERLY BURGESS, et al., | ) | |
| | ) | **ON APPEAL FROM THE UNITED** |
| Plaintiffs-Appellants, | ) | **STATES DISTRICT COURT FOR THE** |
| | ) | **WESTERN DISTRICT OF KENTUCKY** |
| v. | ) | |
| | ) | |
| PADUCAH AREA TRANSIT | ) | |
| AUTHORITY, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:  SILER and CLAY, Circuit Judges, and GRAHAM, District Judge.[*]

GRAHAM, District Judge.  Three former at-will employees of the Paducah Area Transit Service ("PATS") allege that they were terminated after having raised concerns about the safety of PATS vehicles.  They allegedly voiced their concerns in two letters sent to the PATS board of directors, though the letters on their face did not mention any safety issues.  The letters reported that the "atmosphere in the office [had] deteriorated" and accused management of "poor business practices."  Plaintiffs brought claims of First Amendment retaliation and wrongful termination against PATS, a political subdivision of the City of Paducah, Kentucky, and against two PATS office managers and the members of the PATS board of directors.  They also asserted a defamation claim over the release by PATS of documents relating to plaintiffs' terminations to a local newspaper that had made an open records request under Kentucky law.  The district court granted summary

_____

[*] The Hon. James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

judgment to the defendants on all claims, and appellants filed this appeal.[1]  For the reasons stated

below, we AFFIRM.

## I.

PATS provides mass public transit for the city of Paducah.  In 2002, it operated

approximately 32 vehicles, mostly passenger buses and vans, and provided ground transportation for

an annual quilt show held in Paducah.  Defendant Gary Kitchin was the general manager of PATS,

serving in that capacity as chief executive and administrative officer under the general direction of

the PATS board of directors.  Plaintiff Kimberly Burgess was employed by PATS as a phone

operator from 2000 to July 2002.  Plaintiff Shelly Turner worked from 1999 to July 2002 as the

project manager for the contract that PATS had with the Commonwealth of Kentucky to provide

service to Medicaid recipients needing transportation to and from their medical providers.  Plaintiff

Karen Glisson worked from 1999 to August 2002 as an office assistant and part-time driver.

### A.  The Letters

On February 21, 2002, nine office employees, including plaintiffs, signed a letter addressed

to the PATS board of directors.  The letter read as follows:

> We, the undersigned employees of the PATS office staff, come to you in confidence
> to request a face to face meeting, with all of you, to air concerns we have relating to
> the management.
>
> First, let us express, we all enjoy our jobs very much and the opportunity to work at
> PATS, however; the atmosphere in the office has deteriorated to a point which we
> feel that we would be doing a disservice to the overall well being of the PATS
> organization, if we do not bring this matter to the attention of the governing body, the
> board of directors.  Our concerns are serious and sensitive enough that we feel it best
> [that they] not be put in print, therefore; we request you arrange a meeting with the
> undersigned office staff employees.  We trust you will hold this communication and

---

[1]  Plaintiff Alpha Mae Tate did not appeal the district court's dismissal of her claims.

the subsequent meeting in the strictest confidence. Only those signed below and yourselves need be involved at this time.

The letter instructed the board to contact Shelly Turner, which they did. In separate conversations with three board members, Turner said that the employees' concerns related to their general manager, Gary Kitchin, whose "moods" and high level of stress caused the staff to "walk on eggshells" and be "edgy." Turner mentioned also that there were "driver issues" they wanted to talk about, but she did not elaborate or specifically raise any safety concerns. Turner repeated the letter's request for a meeting, but one did not take place.

A second letter was sent in late May 2002, addressed again to the board of directors. Glisson wrote the letter, which was signed by Glisson, Burgess, and three other employees, but not by Turner. The letter stated:

> We the undersigned employees of PATS come to you again, in strict confidence requesting a meeting with all of you to discuss several issues of poor business practices, management and other concerns we feel are detrimental to the future well being of the PATS organization.
>
> The issues we brought to your attention in our previous request have had some improvement for a short time, however; there has not been an overall modification of several issues of importance, and some new problems have arisen.
>
> Because of the sensitive nature of some of the items we wish to bring to your attention and the possibility of some of the issues being discussed with senior management prior to our meeting, we will not put them to a written form until we meet face to face.

Though Glisson thought she had thrown the letter away without mailing it, board member Danny Murphy apparently received the letter.

Kitchin became aware of the second letter, and he called an office staff meeting on June 3, 2002 in which he stated that if employees had any problems, they should come see him. According to certain employees in attendance at the meeting, Glisson told Kitchin that the letters were sent

because "of safety concerns for drivers [and] because the buses were in poor mechanical condition." When asked at her deposition about the staff meeting, Glisson testified that she could not recall what she had said.

## B. Plaintiffs' Terminations

### 1. Burgess and Turner

Burgess's primary responsibility as a phone operator was to arrange transportation for Medicaid clients and enter the information into the PATS computer system. According to records kept by PATS for June 6, 2002 through Burgess's termination on Friday, July 12, 2002, the two other phone operators logged well over double the hours and inbound calls that Burgess did. On July 12, Kitchin and operations manager Kim Adair showed the phone records to Burgess and informed her that she was being terminated because she "was not doing the job [she] was hired for." The disciplinary action form for Burgess stated the reasons for her discharge as gross inefficiency, gross neglect of her duties, and "failure to work."

Burgess believed the phone records to be inaccurate and asked if she could come back to have the records checked. Kitchin said that she could return Tuesday, July 16, 2002 and meet with Adair about the accuracy of the records. Before the meeting took place, Burgess and Turner arranged to meet at the office on Saturday, July 13 so Burgess could "get proof to show them that the phone logs were wrong." They met at the office and Burgess went to her former computer work station while Turner went to her office. Burgess examined trip data on the computer system, looking for her initials next to the Medicaid trips she had arranged. Turner too looked for the same information from her computer. The names and social security numbers of clients were displayed on the computer as they looked through the trip data.

While Burgess and Turner were on the computers, Kitchin came into the office before leaving on a business trip. He asked what they were doing there and told Burgess that she was not supposed to come in until Tuesday, when she was to meet with Adair. Turner thought that Burgess had been given permission to "prove her job," but Turner did not know Burgess was supposed to have waited until Tuesday to come in, and she admitted that it was "a bad decision" to let Burgess into the office. Turner had signed an Employee Confidentiality/Security Agreement, under which "causing confidential information and/or records to be accessed or released" by "other individuals, clients, relatives, etc., outside the scope of [the employee's] assigned job duties would constitute a violation of this agreement and may result in disciplinary action taken against [the employees], up to and including dismissal." The Agreement defined as "confidential" any records or reports that identified a patient or client.

On Thursday, July 18, Kitchin returned from his trip and called Turner into his office and offered her a resignation agreement with a severance check. The next day, Turner informed Kitchin that she had decided against signing the agreement. Kitchin then terminated her, effective July 18, and gave her a disciplinary action, which stated the grounds for termination as dishonesty, personal use of PATS property, and allowing a terminated employee unauthorized access to the office and to the computer system, in breach of the confidentiality agreement.

### 2. Glisson

Glisson received a written warning on August 1, 2002 from Kitchin for failing to report for work. On the next day, Glisson sent a letter to Kitchin accusing him of lying, creating a hostile work environment, and retaliating against her for "participating in an investigation [into] other charges against [Kitchin] and PATS." She also sent a "memorandum" to the board of directors stating that the warning was falsely issued in retaliation for her participation in the February 21, 2002 letter. She

noted that the purpose of the meeting requested in the letter would have been "to share with the board several concerns regarding problems with the organization relating to employee/employer relations, safety, working environment and other issues that upper management has refused to address."

Glisson was involved in two additional incidents in August. On August 14, she was outside the entrance to the PATS office when Adair and Adair's husband approached the building. Glisson asked, "Does your husband know you're messing around with someone else?" Glisson claims that she was just joking and that she and Adair had exchanged similar comments before. On August 23, Glisson got into a disagreement with co-worker Angie Jones when Jones approached her about buying something. According to Glisson, she was under a lot pressure at the time and she "just unloaded" on Jones, but did not yell or scream at her. Glisson was upset that Jones had a few days earlier signed a letter criticizing Turner, and she viewed that as "stabbing a knife in Shelly's back."

On August 27, 2002, Kitchin signed a disciplinary action terminating Glisson. The stated grounds for termination were improper and discourteous conduct displayed in the comment made to Adair and her husband and in the confrontation with Jones.

## II.

This court reviews the district court's grant of summary judgment *de novo*. *Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in the non-moving party's favor. *Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 393 (6th Cir. 2008).

## A. First Amendment Retaliation

For public employees to establish a claim under 42 U.S.C. § 1983 that their termination violated the First Amendment, they must demonstrate that:

(1) they were engaged in a constitutionally protected activity; (2) the adverse employment action caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of plaintiffs' constitutional rights.

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)*; Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 477-78 (6th Cir. 2006).

Individuals who enter government service "do not surrender all their First Amendment rights by reason of their employment," but they "must accept certain limitations on [their] freedoms." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The interest of a public employee "in commenting on matters of public concern" must be balanced against the interest of governmental employers "in promoting the efficiency of the public services it performs through its employees." *Id*. at 417. The initial inquiry "requires determining whether the employee spoke as a citizen on a matter of public concern." *Id*. at 418 (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 (1968)). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id*. If the answer is yes, then the "question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. *See also Haynes v. City of Circleville*, 474 F.3d 357, 363-64 (6th Cir. 2007).

A public concern is one relating to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). A court should examine the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. "Because of the need to provide government officials with the ability to manage their offices without 'intrusive oversight by the judiciary,' . . . our concern must be to protect those expressive activities of a public employee when he speaks as a citizen on a public matter; that concern ordinarily does not extend to a public employee's speaking as an employee on matters only of his personal interest." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 965 (6th Cir. 2002) (quoting *Connick*, 461 U.S. at 146).

Though speech aimed to protect public safety is potentially a matter of public concern, *Hoover v. Radabaugh*, 307 F.3d 460, 466-67 (6th Cir. 2002), plaintiffs' speech was predominately concerned with issues relating to office management and therefore does not merit First Amendment protection. The letters do not describe or even suggest any concerns about the safety or condition of PATS vehicles. Plaintiffs' stated purpose in the first letter was to request a meeting in which they could voice concerns "relating to management," including the deterioration of "the atmosphere in the office." The second letter repeated the request for a meeting and identified plaintiffs' concerns as relating to "poor business practices, management and other concerns we feel are detrimental to the future well being of the PATS organization." The content of the letters makes clear that plaintiffs spoke as employees and not as citizens regarding a matter of public concern.

Plaintiffs contend that bus safety issues were really what was on their minds, despite the letters not identifying such issues. In support, they cite three occasions where plaintiffs mentioned "driver issues" to management. When board members spoke with Turner following the first letter, she told them that there were "driver issues" they wanted to talk about. At the June 3, 2002 staff

meeting, Glisson told Kitchin that the letters were sent because "of safety concerns for drivers [and] because the buses were in poor mechanical condition." Finally, at some unspecified time, Burgess informed Adair about an elderly coworker driving a bus that did not have working air conditioning.

Even if these communications informed Kitchin, Adair, or the board that there was more behind the letters than plaintiffs' troubles with office management, they do not qualify as protected speech. In evaluating the speech of a public employee, the court may look to the employee's duties, "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007). The communications focused on driver safety and thus had their impetus in plaintiffs' concern for their coworkers, not the safety of passengers. Though Glisson did tell Kitchen at the staff meeting of mechanical problems with the buses, she drove a bus part-time and operated the quilt show buses that were allegedly in poor condition. Regardless of whether Glisson spoke out of concern for herself, other drivers, or her passengers, a bus driver's report of mechanical problems falls within her job responsibilities. *See Garcetti*, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *Weisbarth.*, 499 F.3d at 544 (speech by public employee not protected if it "owes its existence to [the speaker's] professional responsibilities").

Moreover, plaintiffs made their communications at the workplace and directed them to management. *See Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 349, (6th Cir. 2010) (holding that a school teacher's complaints to her supervisor about class size were not protected). As the Fifth Circuit observed, courts have consistently held that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job

duties, that speech is undertaken in the course of performing his job." *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (citing cases). This case is therefore distinguishable from *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 256-57 (6th Cir. 2006), where a public employee's speech involved "content largely unrelated to government employment" and was directed "to a public audience, outside the workplace."[2]

We further find that there is no genuine issue of fact that PATS had legitimate, non-retaliatory reasons to discharge each plaintiff. To satisfy the third prong of their First Amendment retaliation claim, plaintiffs must show that their terminations were motivated at least in part by the exercise of their free speech rights. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). An employee must establish a link between "the speech in question [and] the defendant's decision to dismiss." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). Ordinarily, causation is a question to be resolved by a jury, but a court may grant summary judgment on the issue of causation when there is no genuine issue of material fact from which a reasonable jury could conclude that the employee's discharge was motivated in part by her speech. *Id*. (citing *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996)).

Plaintiffs have put forward no evidence from which a reasonable jury could conclude that they were terminated because of their concerns about the safety of PATS vehicles. That their terminations followed the letters in time is alone not sufficient. *See Bailey*, 106 F.3d at 144-45 (noting that at summary judgment stage, an employee "may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent."). The factual grounds for the terminations of Burgess and Glisson indeed are not refuted by plaintiffs. It is

---

[2] Glisson had discussions about the condition of PATS vehicles with the mayor and a city commissioner; however, neither Kitchin nor Adair knew of this and Glisson cannot show that her termination was motivated at least in part as a response to those communications.

undisputed on the record that Burgess failed to adequately perform her job duties and that Glisson – on a workday in front of the PATS building, with Adair's husband present – asked Adair, "Does your husband know you're messing around with someone else?" It is further undisputed that the conduct of Burgess (gross inefficiency and neglect of duty) and Glisson (discourtesy to fellow employees) expressly constituted adequate grounds for discipline, up to and including discharge, under §5.4.B of the PATS personnel manual.

Only Turner argues that the grounds for her termination were pretextual. She claims that PATS selectively enforced the confidentiality agreement. But we find this argument without merit because it refers to two coworkers who brought their children into the office and let them play games on the computer. These examples are not comparable to Turner's conduct in allowing a discharged employee to have unauthorized access to the PATS computer system so she could gather data to challenge her termination.

## B. Wrongful Discharge

The tort of wrongful discharge is limited under Kentucky law to situations where the discharge is "contrary to a fundamental and well-defined public policy as evidenced by existing law," either in "a constitutional or statutory provision." *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Causation is established where the reason for the discharge is a "failure or refusal to violate a law in the course of employment," or "the employee's exercise of a right conferred by well-established legislative enactment." *Id*.

Plaintiffs allege that they were discharged because they refused to falsify vehicle inspection forms and to operate unsafe vehicles. They argue that the public policy implicated by their refusal to falsify forms is embodied in Kentucky Revised Statutes § 517.050 (falsifying business records) and § 523.100 (unsworn falsification to authorities). As to their refusal to drive unsafe vehicles,

plaintiffs cite numerous federal and state motor vehicle regulations. *See, e.g.*, 49 C.F.R. § 396.7 (unsafe motor vehicle operation forbidden), K.R.S. § 189.224 (unlawful motor vehicle operation).

The record is devoid of evidence to support the wrongful discharge claims. There is no instance where any of the plaintiffs refused to falsify a form. The purported evidence cited by plaintiffs relates to Kitchin instructing Alpha Mae Tate, a safety inspector, to sometimes return vehicles to service after Tate had completed forms to remove them. Plaintiffs do not cite a single instance where Kitchin instructed Burgess, Turner, or Glisson to falsify a form or a single instance where they refused to do so, let alone establish a causal link to their terminations.

The evidence is likewise lacking as to plaintiffs' alleged refusal to drive unsafe vehicles. Though plaintiffs cite a couple of instances where Glisson and Turner drove quilt show buses with mechanical problems, there is no evidence that plaintiffs refused to drive unsafe vehicles or that such a refusal is what motivated Kitchin to terminate them. And as defendants correctly point out, not until this appeal did plaintiffs premise their wrongful discharge claims on a refusal to drive unsafe vehicles.

### C. Defamation

After plaintiffs were terminated, but before their grievance hearings took place on September 5, 2002, the Paducah Sun submitted a records request to PATS. Kitchin responded to the request on August 30, 2002 by producing copies of the disciplinary action forms for each of the plaintiffs. Plaintiffs allege that Kitchin's production of the forms was actionable because, at least as to Burgess and Turner, the forms contained untrue statements about plaintiffs acting dishonestly when they examined confidential information on the PATS computer system without permission following Burgess's discharge. *See CMI, Inc. v. Intoximeters, Inc.,* 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) (statements are *per se* actionable if they "either directly or indirectly import 'fraud, dishonesty, or

sharp or unethical practices on the part of the [plaintiff]'") (quoting *White v. Hanks,* 255 S.W.2d 602, 603 (Ky. 1953)).

The elements of a defamation claim are: (1) a defamatory statement; (2) about the plaintiff; (3) which is published; and (4) causes injury to reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (citing *Columbia Sussex Corp., Inc. v. Hay,* 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)).

The issue raised by the parties is whether PATS is immune from liability because Kentucky law required it to produce the records. A recent Kentucky Supreme Court decision recognized a privilege defense whereby "[o]ne who is required by law to publish defamatory matters is absolutely privileged to publish it." *Hill v. Kentucky Lottery Corp.*, __ S.W.3d __, 2010 WL 1636870, at *10 (Ky. Apr. 22, 2010) (adopting Restatement (Second) of Torts § 592A (1977)). The court noted an exception, which would not apply here, when "one who, with a malicious purpose and under no legal compulsion to do so, creates defamatory material with the expectation that it would be published." *Hill*, 2010 WL 1636870, at *11.

The parties agree that the disciplinary action forms were public records and under the Kentucky Open Records Act "public records shall be open for inspection by any person, except as otherwise provided." K.R.S. § 61.872(1). Plaintiffs argue that the forms nonetheless should not have been produced because their terminations were "preliminary," and they point to the Act's exception for "[p]reliminary drafts, notes, correspondence with private individuals, other than correspondence which is intended to give notice of final action of a public agency." K.R.S. § 61.878(1)(i).

Plaintiffs' only argument in support of its position, however, is that Kitchin's firing decisions were preliminary actions because they were subject to the board's approval. This is not true. Under

the PATS classification plan, the general manager served as chief executive officer and administrative officer. The PATS personnel manual gave the general manager authority to administer the personnel system and take disciplinary actions, including discharge. Black's Law Dictionary defines "preliminary" as "introductory; initiatory; preceding; temporary and provisional." Black's Law Dictionary 1180 (6th ed. 1990). Kitchin's decisions to discharge plaintiffs were not conditional and did not need the board's approval. The general manager had the authority to terminate employees, and the terminations represented his final action. That the discharges could potentially have been set aside by the board during the grievance hearing does not transform the disciplinary action forms into preliminary drafts, notes, or correspondence.

Finally, plaintiffs argue that the district court improperly relied on an advisory opinion letter of the Kentucky Attorney General. Under K.R.S. § 61.880, the Attorney General has the role, when requested, of making determinations on Open Record Act issues; its decisions may be appealed to Kentucky circuit court. PATS solicited an opinion during the course of this litigation, and the Attorney General issued an advisory letter to PATS on March 24, 2006. The letter opinion concluded, based on the fact scenario as posed by PATS, that the Open Records Act required PATS to produce the disciplinary action forms. Plaintiffs' objection must be rejected, however, because the district court did not cite or rely on the advisory opinion. In any event, Kentucky courts generally consider opinions of the Attorney General to be "highly persuasive." *Palmer v. Driggers*, 60 S.W.3d 591, 596 (Ky. Ct. App. 2001).

## III.

For the reasons stated above, we **AFFIRM** the judgment of the district court.