*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DENISE WEISBARTH,

　　　　　　　*Plaintiff-Appellant,*

　　*v.*

GEAUGA PARK DISTRICT, BETTY COPE, ROBERT
MCCULLOUGH, MARK RZESZOTARSKI, TOM CURTIN,
KEITH MCCLINTOCK, RICHARD SHERWOOD, and
DAVID KESSLER, SR.,

　　　　　　　*Defendants-Appellees.*

06-4189

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-02928—Kathleen McDonald O'Malley, District Judge.

Argued: July 24, 2007

Decided and Filed: August 24, 2007

Before: COLE and GILMAN, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Joseph M. Hegedus, OHIO PATROLMEN'S BENEVOLENT ASSN., Columbus, Ohio, for Appellant. David S. Kessler, BLAUGRUND, HERBERT & MARTIN, Dublin, Ohio, for Appellees. **ON BRIEF:** Joseph M. Hegedus, OHIO PATROLMEN'S BENEVOLENT ASSN., Columbus, Ohio, Kevin P. Powers, OHIO PATROLMEN'S BENEVOLENT ASSN., North Royalton, Ohio, for Appellant. David S. Kessler, BLAUGRUND, HERBERT & MARTIN, Dublin, Ohio, Stephen P. Postalakis, BLAUGRUND, HERBERT & MARTIN, Worthington, Ohio, for Appellees.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Denise Weisbarth, a park ranger for the Geauga Park District (GPD) in Geauga County, Ohio, was fired from her job in September of 2004. Following her termination, Weisbarth filed a First Amendment retaliation action pursuant to

_____
[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

42 U.S.C. § 1983, asserting that the GPD fired her due to comments she had made to a consultant hired by the GPD to interview employees as part of a departmental evaluation. The district court dismissed her complaint for failure to state a claim that she had engaged in speech protected by the First Amendment. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

Weisbarth began her employment with the GPD as a part-time park ranger in 1997. She became a full-time park ranger in 2003. Under Ohio law, park rangers are fully commissioned police officers. Ohio Rev. Code Ann. § 1545.13(B). During her tenure as a park ranger, Weisbarth led an initiative to institute a canine-handling team and subsequently became the department's official canine handler.

Weisbarth alleges that the Ranger Department as a whole began suffering "serious morale and performance problems" in 2003. Management responded to these problems in October of 2003 by hiring Richard Sherwood, a paid consultant, to evaluate the department. As part of Sherwood's evaluation, he rode along with Weisbarth in her patrol vehicle during one of her shifts. Weisbarth's First Amendment claim is based exclusively on the conversation that took place during this ride-along.

The first topic that Weisbarth discussed with Sherwood was a disciplinary "letter of counseling" that Weisbarth had recently received. Weisbarth told Sherwood that she intended to write her own rebuttal letter for placement in her personnel file. Sherwood allegedly told Weisbarth that he thought this proposed course of action would be unwise and contrary to "team efforts."

The second topic discussed by Weisbarth and Sherwood concerned "morale and performance problems within the Ranger Department." Weisbarth claims that, when she answered Sherwood's questions about these topics honestly, Sherwood "reported her comments to Geauga Park District as expressing a personal dislike for nearly all of her co-workers." At oral argument before the district court regarding the GPD's motion to dismiss, Weisbarth's counsel clarified that this ride-along conversation was the sole basis for Weisbarth's First Amendment claim, and that Sherwood had, as part of his departmental evaluation, spoken with all department employees individually.

The remainder of Weisbarth's complaint sets forth her subsequent interactions with the GPD management that led up to her termination. She contends that, as a result of her ride-along discussions with Sherwood, he labeled her a "source of 'friction'" and developed a "strategy" for getting her fired. This strategy was allegedly put into action when Weisbarth experienced a family crisis and left town without notifying her supervisors. Upon her return, a "heated" meeting took place at which Weisbarth was questioned about her failure to provide notification prior to her absence. According to the complaint, "Weisbarth became emotional and allegedly slammed open a couple of doors as she left the meeting."

The GPD ordered psychological testing for Weisbarth in the aftermath of this meeting, and the examining psychologist found her to be unfit for duty. Weisbarth, however, obtained a second psychological evaluation through the employees' union, and that psychologist reached the opposite conclusion. In response, the GPD ordered Weisbarth to see a tie-breaking third psychologist. The third psychologist agreed with the first psychologist's assessment and found Weisbarth unfit for duty. Weisbarth was fired in September of 2004, shortly after this third evaluation. She claims that the two psychologists who found her unfit for duty conspired with the GPD, and that the real motive for her termination was her allegedly protected speech to Sherwood during the ride-along.

Weisbarth filed a grievance through her union, and the arbitrator ultimately agreed with her position. Although the arbitrator concluded that Weisbarth "should be reinstated," he also suggested that, in light of their differences, the parties "may wish to sit down and work out a separation arrangement." The record does not disclose Weisbarth's current employment status.

## B.    Procedural background

Weisbarth filed this § 1983 action in the United States District Court for the Northern District of Ohio in December of 2005. The defendants thereafter filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Weisbarth had failed to state a claim that she engaged in speech protected under the First Amendment. Included in the GPD's motion to dismiss were transcripts of the testimony offered at Weisbarth's earlier arbitration hearing. Our review of that material, however, reveals that it does not further elucidate the central issue in this case regarding Weisbarth's ride-along discussion with Sherwood. The transcripts instead illustrate numerous occurrences both before and after the ride-along that caused the deterioration of Weisbarth's relationship with the GPD, such as her alleged role in a dog-bite incident and in the improper disposal of a racoon—events about which Weisbarth ultimately took (and passed) a polygraph examination. In her brief, Weisbarth also highlights testimony from the arbitration hearing indicating that she had been elected as the representative of the Ranger Department's employee union, but that fact appears to be otherwise unrelated to her claim.

The district court held a hearing to address the various defendants' motions to dismiss in August of 2006. After hearing arguments from the parties, the court issued a detailed ruling from the bench, dismissing Weisbarth's complaint. The court subsequently filed a written dismissal order that simply incorporated its earlier oral ruling. Weisbarth timely filed the present appeal from the district court's dismissal order.

## II.  ANALYSIS

### A.    Standard of review

A district court's dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed de novo. *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). All well-pled allegations of the complaint are taken as true. *Id.* "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Id.* This court conducts essentially the same analysis as the district court in that "we take the plaintiff's factual allegations as true and if it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim[] that would entitle [her] to relief, then . . . dismissal is proper." *Id.* (quotation marks omitted) (ellipses in original).

Recently, however, the Supreme Court revised the "no set of facts" portion of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). *Twombly* held that the "famous" no-set-of-facts formulation "has earned its retirement," and instead dismissed the plaintiff's antitrust-conspiracy complaint because it did not contain facts sufficient to "state a claim to relief that is *plausible* on its face." *Id.* at 1974 (emphasis added). Significant "uncertainty as to the intended scope of the Court's decision [in *Twombly*]" persists, however, particularly regarding its reach beyond the antitrust context. *Iqbal v. Hasty*, No. 05-5768-CV, --- F.3d ---, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (applying the plausibility standard in the context of a motion to dismiss Iqbal's § 1983 claims based on qualified immunity).

The Second Circuit in *Iqbal* closely analyzed the text of *Twombly* and determined that it

> is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.

*Id.* (emphasis in original). *Iqbal* thus held that *Twombly*'s plausibility standard did not significantly alter notice pleading or impose heightened pleading requirements for all federal claims. Instead, *Iqbal* interpreted *Twombly* to require more concrete allegations only in those instances in which the complaint, on its face, does not otherwise set forth a plausible claim for relief. *See Iqbal*, 2007 WL 1717803, at *23 (determining that Iqbal's excessive-force claim—premised on supervisor liability—did not require Iqbal to plead "subsidiary facts" concerning the warden's knowledge because "it [was] at least plausible that a warden would know of mistreatment inflicted by those under his command"); *see also Collins v. Marva Collins Preparatory Sch.*, No. 1:05cv614, 2007 WL 1989828, at *3 n.1 (S.D. Ohio July 9, 2007) (noting that eight federal district courts in the Sixth Circuit have thus far applied *Twombly* in the manner described in *Iqbal*, while only one has restricted *Twombly* to the antitrust-conspiracy context).

Ultimately, as explained below, our disposition of Weisbarth's claim does not depend upon the nuances of *Twombly*'s effect on the dismissal standard. We therefore need not resolve the scope of that decision here.

**B.     First Amendment protection**

Taking all of the factual allegations in Weisbarth's complaint as true, the essence of her claim is that: (1) the GPD hired a consultant to evaluate the department, (2) the consultant asked department employees, including Weisbarth, about "morale and performance" issues, and (3) when Weisbarth gave honest answers that either the consultant or the GPD did not like, she was fired. An arbitrator ultimately agreed with Weisbarth that her termination was unjust. Weisbarth's appeal, however, does not require us to pass judgment upon the wisdom or propriety of her termination. Instead, it requires a determination only of whether Weisbarth has stated a claim that she was terminated for engaging in speech protected by the First Amendment.

In order for a government employee's speech to warrant First Amendment protection, the Supreme Court's *Connick* and *Pickering* decisions have long imposed the threshold requirements that the employee (1) must have spoken "as a citizen," and (2) must have "address[ed] matters of public concern." *See, e.g., McMurphy v. City of Flushing*, 802 F.2d 191, 197 (6th Cir. 1986) (holding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior"). The Supreme Court clarified the first of these requirements in *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006), by holding that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes." (Emphasis added.)

Following briefing and argument from the parties below, the district court determined that *Garcetti* did not preclude Weisbarth's claim. Although the court did not specifically articulate the ground on which it distinguished *Garcetti*, it apparently concluded that Weisbarth's talk with Sherwood was not explicitly part of her official job description as a park ranger. The court expressed concern that "expanding" *Garcetti* to preclude First Amendment protection in this case would permit employers to hire consultants to "solicit statements from employees that then could be used against the employee." Instead, the court determined that, irrespective of whether

Weisbarth's alleged speech occurred pursuant to her official duties, the speech simply did not address a matter of public concern. That alternative ground formed the basis for the district court's dismissal. We will address both of these possible grounds in turn.

### 1.          *Weisbarth did not speak "as a citizen"*

Weisbarth's complaint emphasizes (apparently believing that it strengthens her case) the fact that Sherwood was hired by the GPD specifically to evaluate the Ranger Department and to interview its employees. The ride-along conversation between Weisbarth and Sherwood thus took place in the context of Sherwood's official duty to interview Weisbarth regarding the very subjects about which they primarily spoke: morale and performance issues. (Because Weisbarth makes no argument regarding the first topic of conversation alleged in her complaint—the "letter of counseling" that she had received—and because that topic presents a very weak claim for First Amendment protection, we will not address it further.) We therefore accept as a fact for the purpose of Rule 12(b)(6) that the GPD desired Sherwood to ask and Weisbarth to answer the job-related questions that Sherwood posed so that he could complete his departmental evaluation.

The Supreme Court's holding in *Garcetti* leads us to the conclusion that such speech is not protected under the First Amendment. In that case, plaintiff Ceballos had been employed as a calendar deputy for the Los Angeles County District Attorney's Office. 126 S. Ct. at 1955. A defense attorney at one point asked Ceballos to look into possible inaccuracies in an affidavit that had been used to obtain a search warrant in one of the cases that the District Attorney's Office was actively prosecuting. *Id*. Pursuant to his duties as calendar deputy, Ceballos investigated and wrote a memo to his supervisor that expressed concerns over the affidavit. *Id*. The District Attorney's Office nevertheless decided to continue prosecuting the case, and Ceballos was ultimately called by the defendant to testify about his concerns over the warrant. *Id*. Following the incident, Ceballos was fired by the District Attorney's Office. *Id*. at 1956. In response, he brought a First Amendment retaliation claim, asserting that he was unconstitutionally terminated due to the speech contained in his written memo. *Id*.

The Supreme Court held that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id*. at 1959-60. Furthermore, the Court explained that

> the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case . . . distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
>
> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. . . . The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 1960.

We next consider three possible grounds that could conceivably distinguish *Garcetti* from the present case. First, Weisbarth argues that speaking with Sherwood was not actually part of her "official duties" as a park ranger. Weisbarth's obligation to aid Sherwood in his evaluation might

instead be more accurately termed an "ad-hoc" duty that arose in the course of Weisbarth's employment. Because the parties in *Garcetti* did not dispute that Garcetti's speech was made pursuant to his official duties, the Court "ha[d] no occasion to articulate a comprehensive framework for defining the scope of an employee's duties." *Id*. at 1961. Nevertheless, the Court acknowledged the difficulty of pinning down static job descriptions and explained that

> [f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id*. at 1962. *Garcetti* thus implicitly recognized that such ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description. Moreover, Weisbarth's speech indisputably "owes its existence to [her] professional responsibilities," as did Garcetti's. *See id.* at 1960.

This court's recent decision in *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007), also strongly undercuts any significance that might otherwise attach to this distinguishing factor. Haynes, like Weisbarth, was a canine trainer for a local police force in Ohio. When police administrators decided to institute cost-cutting measures that reduced dog-training hours, Haynes became upset and wrote a memo expressing his concern that the reduced training would render the police dogs less effective and would potentially endanger the public. Haynes was ultimately fired as a result of the memo and other various protests that he had lodged against management.

This court held that Haynes's complaints about the reduction in dog training, although obviously not part of his official written job description, occurred as part of "carrying out his professional responsibilities" of training dogs, and therefore were made "pursuant to his official duties." *Id*. at 364. Weisbarth's discussion with Sherwood—a consultant hired by Weisbarth's employer to interview her about the Ranger Department in order to create a departmental evaluation—actually presents a stronger claim for fitting within her official duties than did Haynes's written complaint. *Haynes*, therefore, counsels that the degree to which Weisbarth's speech corresponded with her official job description does not adequately differentiate her case from *Garcetti*.

A second possible distinction relates to the fact that Weisbarth, unlike Ceballos or Haynes, was specifically asked by her employer, through Sherwood, to comment about the very matters that her speech addressed. This distinction, however, does not lead to a different result. For one thing, although Ceballos may not have been specifically asked by his employer to prepare the memo at issue in that case, he was under a general obligation to occasionally write memos to his supervisors regarding pending cases. *Garcetti*, 126 S. Ct. at 1960. Moreover, this distinction simply serves, if anything, to render Weisbarth's actions more closely linked to her official duties. The fact that Weisbarth was allegedly fired for voicing her concerns over departmental morale and performance issues when explicitly asked to do so by an agent of the GPD thus tends to make its action more constitutionally defensible in this instance, albeit also more difficult to understand. Indeed, a contrary determination—that Sherwood's specific questioning somehow rendered Weisbarth's response outside of her official duties—would be logically insupportable.

A third and final possible distinction is that Weisbarth's speech arose in the context of addressing inquiries of a third-party consultant hired by her employer, whereas *Garcetti* and *Haynes* both involved speech made directly to the employee's supervisor. The reasoning of *Garcetti* and *Haynes*, however, makes clear that the determinative factor in those cases was not where the person to whom the employee communicated fit within the employer's chain of command, but rather

whether the employee communicated pursuant to his or her official duties. *See, e.g., Garcetti*, 126 S. Ct. at 1961 (stating broadly that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities").

In sum, none of the proposed distinctions between Weisbarth's case and *Garcetti* justifies departing from the result reached in that case, and this court's opinion in *Haynes* simply reinforces that conclusion. The district court, however, raised an additional policy concern about dismissing Weisbarth's claim based on *Garcetti*. Such a holding, the court feared, would permit government employers to solicit statements from employees on any range of personal or political issues—ostensibly pursuant to their official duties—and then use those statements against them.

Concern over this unsettling possibility, however, strikes us as unfounded because the pursuant-to-official-duty inquiry ultimately cannot be completely divorced from the content of the speech. As explained in Part II.B.2. below, *Garcetti* stands for the proposition that even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties. But the analysis in both *Garcetti* and *Haynes* suggests that the content of an employee's speech—though not determinative—will inform the threshold inquiry of whether the speech was, in fact, made pursuant to the employee's official duties. *See Garcetti*, 126 S. Ct. at 1960 (noting that "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor *about how best to proceed with a pending case*" (emphasis added)); *id.* at 1961 (citing *Rankin v. McPherson*, 483 U.S. 378, 384 (1987), for the proposition that "discussing politics with a co-worker" would not generally qualify as speech made pursuant to employment responsibilities); *Haynes*, 474 F.3d at 357 (examining both the context and content of Haynes's memo before concluding that it was written pursuant to his official duties).

In this case, the GPD hired Sherwood for legitimate departmental business, and the topics about which he questioned Weisbarth—employee morale and performance—obviously concerned her day-to-day official duties. Although firing Weisbarth based on her assessment of department morale and performance may seem highly illogical or unfair, the relevant question is whether the firing violated her free-speech rights under the First Amendment. *Garcetti* informs us that it did not. Implicitly acknowledging the potential inequity that its holding might countenance, the Court in *Garcetti* explained that

> [t]he dictates of sound judgment are reinforced by the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing. Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the First Amendment. These imperatives, as well as obligations arising from any other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions.

126 S. Ct. at 1962 (citations and quotation marks omitted). Thus, although taking action against a public employee for speech made pursuant to official duties might give rise to antidiscrimination, whistleblower, or labor-contract claims, it does not violate the First Amendment.

Weisbarth's reliance on *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986), in which this court reversed a grant of summary judgment in favor of the employer regarding a First Amendment retaliation claim, is misplaced. The court in that case found the employee's speech to be protected where he spoke to police officers regarding a criminal investigation of his public employer, a state mental-health board. In fact, the court emphasized that "Marohnic's speech was induced by civic commitment" to cooperate with law enforcement, rather than by any official duty related to his

employment. *Id.* at 616. *Marohnic* thus differs materially from the present scenario where Weisbarth spoke solely about departmental morale and performance issues to an agent of the GPD at the GPD's behest.

Weisbarth's reliance on *Jackson v. City of Columbus*, 194 F.3d 737, 746-47 (6th Cir. 1999), *abrogated in part on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), is similarly inapposite. The court in that case reversed the district court's dismissal of a First Amendment claim by the Columbus, Ohio Chief of Police regarding a gag order that the city had placed on him pending an investigation of possible wrongdoing on his part. Jackson's speech to the press about the investigation, set against his employer's efforts to silence him, was not made pursuant to his official duties.

Weisbarth finally asserts that we should be hesitant to dispose of her First Amendment retaliation case based solely on the pleadings. But that consideration has little application to the present inquiry of whether Weisbarth spoke pursuant to her official duties. The facts required to reach this conclusion—such as Weisbarth's employment duties, the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter—are all set forth in the pleadings. Weisbarth's complaint thus makes clear that she spoke pursuant to her official duties rather than "as a citizen," and her claim was therefore properly dismissed.

### 2. *Matters of public concern*

Our determination that Weisbarth spoke pursuant to her employment responsibilities alleviates the need to address the district court's conclusion that Weisbarth's speech did not touch on matters of public concern. The Supreme Court explained in *Garcetti* that when public employees speak pursuant to their official duties rather than as citizens, "the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S. Ct. at 1960. Indeed, Garcetti's claim was based upon a memo in which he alleged that the government had executed a search warrant based upon an affidavit that contained "serious misrepresentations." *Id.* at 1955. Despite the Court's acknowledgment that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," it nevertheless rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." *Id.* at 1962; *see also Mills v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006) ("*Garcetti* . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job. Only when government penalizes speech that a plaintiff utters 'as a citizen' must the court consider the [*Connick/Pickering* analysis].").

We therefore simply note that our decision to affirm the dismissal of Weisbarth's complaint is made even easier in this case by her failure to allege that any of the speech that she engaged in touched on a matter of public concern. By expressly confining her allegations to speech regarding internal departmental "morale and performance," Weisbarth tacitly acknowledges that her speech addressed only day-to-day matters directly related to her job as a park ranger. *See Connick v. Myers*, 461 U.S. 138, 141 (1983) (holding that questions regarding "office transfer policy, *office morale*, the need for a grievance committee, [and] the level of confidence in supervisors," in a questionnaire distributed by an employee were not matters of public concern (emphasis added)). In any event, we find no need to definitively resolve this public-concern prong of the *Connick* analysis in light of our earlier conclusion that Weisbarth spoke pursuant to her official duties.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.