Tom STINEBAUGH, Plaintiff–Appellee,

v.

CITY OF WAPAKONETA, et al.,
Defendants–Appellants.

No. 14–4262.

United States Court of Appeals,
Sixth Circuit.

Nov. 10, 2015.

BEFORE: SILER, ROGERS, and STRANCH, Circuit Judges.

SILER, Circuit Judge.

Tom Stinebaugh ("Stinebaugh") filed a First Amendment retaliation claim against his employer. William Rains ("Rains") and Kendall Krites ("Krites") appeal the district court's denial of their motion for summary judgment on the grounds of qualified immunity. The City of Wapakoneta (the "City") appeals the district court's denial of summary judgment on Stinebaugh's *Monell* claim. For the following reasons, we **AFFIRM** the district court's denial of summary judgment as to Rains's and Krites's qualified immunity claim and **DISMISS** for lack of jurisdiction the appeal of the district court's denial of summary judgment on Stinebaugh's claim against the City.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Stinebaugh was employed by the City as a firefighter from 1992 until he was promoted to fire captain in 2006. He lived in and paid taxes to the City. In 2011, Fire Chief Krites told the fire department employees that he planned to purchase a new heavy rescue engine ("Unit 242") for $474,000. Rains, the Director of Safety Services, supported Krites's plan. In the past, the fire department's practice was to use a rescue engine for forty years. However, the existing heavy rescue engine, which was purchased in 1995, had low miles and was the fire department's second newest truck.

After learning of Krites's and Rains's plan to replace a heavy duty engine that was just over fifteen years old, Stinebaugh contacted three members of the Wapakoneta City Council to express his opinion that purchasing Unit 242 was not a good use of taxpayer money. Stinebaugh first called Steve Henderson ("Henderson"), the City Council President. Stinebaugh then called Jim Neumeier ("Neumeier"), who served as his ward's representative. Finally, Stinebaugh called Dan Lee ("Lee"), a representative from another ward.

According to Stinebaugh, his telephone conversations with Henderson, Neumeier and Lee were similar in that he expressed his concerns to each of them as a taxpayer about the purchase of Unit 242. Henderson testified that when Stinebaugh called he began the conversation by introducing himself as "a concerned tax paying citizen of Wapakoneta," and he did not mention his position with the fire department. Similarly, Lee testified that Stinebaugh called as a citizen—not as a representative of the fire department. Although Neumeier testified that Stinebaugh did not explicitly tell him that he was calling as a "private citizen," he also testified that Stinebaugh never associated himself with the fire department. Stinebaugh's conversations with the three council members occurred within a several-week period beginning in January 2012.

At the City Council's Finance Committee meeting, Rains and Krites were asked to justify the purchase of Unit 242. Later, Rains learned that a member of the fire department contacted council members to oppose the purchase of Unit 242. Rains then informed Krites that Krites had "an issue" with his department and that he should "find out what it is." Krites began questioning department employees in order to identify who spoke with council members. Initially, Stinebaugh concealed the fact that he had spoken with council members; however, in a subsequent meeting with Krites, he admitted to doing so.

In February 2012, after Rains learned that Stinebaugh had spoken to the council members, Rains placed Stinebaugh on paid

administrative leave and notified Krites of his decision to do so because Rains feared that Stinebaugh would interfere with the City's investigation into his conversations with council members. Although the City has a policy that permits placing employees on paid administrative leave only when the employee poses a health or safety risk,[1] Rains conceded that Stinebaugh's conversations with council members did not pose a health or safety risk to anyone.

In mid-March, Rains held a disciplinary hearing to investigate Stinebaugh's communications with council members. After the hearing, Krites recommended that Rains terminate Stinebaugh. Instead, on the same day of the hearing, Rains demoted Stinebaugh to the position of firefighter effective immediately. As a result of his demotion, Stinebaugh's base pay was reduced, and he was notified that "any future incidents of dishonesty, falsification, or insubordination" would result in termination.

In June 2012, acting Fire Captain Dan Jackson ("Jackson"), Stinebaugh and another fire fighter were dispatched to respond to a fallen tree limb at the library that had injured several people. After they arrived at the scene with the City's only rescue truck, another call came across the radio about a tractor-trailer rollover on I-75. Pursuant to the department's standard operating guidelines, which Krites prepared, the rescue truck shall be used to respond to all motor vehicle accidents. Contrary to the guidelines, Jackson testified that he never authorized Stinebaugh to leave the site of the fallen tree limb and that he told Stinebaugh to wait and see if another crew from the fire department responded to the I-75 call. According to Stinebaugh, there was a miscommunication between him and Jackson because Stinebaugh left the scene and took the rescue truck to respond to the I-75 call. As acting fire captain, it was in Jackson's discretion whether to report and recommend disciplinary action against Stinebaugh. However, after Krites learned from another source that Stinebaugh left the library scene, Krites instructed Jackson to provide a written statement of the events.

In July 2012, Rains again decided to place Stinebaugh on paid administrative leave pending an investigation of the June 2012 events. Rains placed Stinebaugh on administrative leave for the same reasons that he did the first time—fear that Stinebaugh would try to interfere with the investigation. Following the August 2012 disciplinary hearing, Stinebaugh was terminated.

In January 2014, Stinebaugh filed a complaint against the City, Rains and Krites, alleging First Amendment retaliation under 42 U.S.C. § 1983. Rains and Krites moved for summary judgment based on qualified immunity, and the City argued that it was also entitled to summary judgment because there was no evidence of an unconstitutional policy or custom of retaliation. The district court denied the motion for summary judgment.

## STANDARD OF REVIEW

We review "de novo a district court's denial of summary judgment on qualified immunity grounds, because the determina-

---

1. The policy provides that: "When the Appointing Authority determines it is necessary to temporarily remove an employee from the workplace to protect the health or safety of the employee, other employees, or of any person or property entrusted to the employee's care, the Appointing Authority may immediately authorize an administrative leave of absence with pay. Such leave shall normally last only until the investigation predisciplinary hearing, and/or other corrective action is completed."

tion of whether qualified immunity is applicable to an official's actions is a question of law." *See v. City of Elyria,* 502 F.3d 484, 490 (6th Cir.2007) (internal quotation marks omitted).

## DISCUSSION

## I.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 491 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, "whether an official may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (quoting *Poe v. Haydon,* 853 F.2d 418, 422 (6th Cir.1988)).

In determining whether a government official is entitled to qualified immunity, we apply a two-step inquiry: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310 (6th Cir.2005). In this case, the relevant inquiry is: "(1) whether the facts alleged demonstrate a violation of [Stinebaugh's] First Amendment right, and, if so, (2) whether, objectively, a reasonable official in [Rains's or Krites's] position could have believed his conduct to be lawful, considering the state of the law as it existed when he took his challenged actions." *City of Elyria,* 502 F.3d at 490.

## A. First Amendment Violation.

We employ a burden-shifting framework to determine whether an employee has established a claim of First Amendment retaliation. *Benison v. Ross,* 765 F.3d 649, 658 (6th Cir.2014). To establish a *prima facie* case, the employee must demonstrate that: (1) he was engaged in constitutionally protected speech or conduct; (2) he was subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in that speech or conduct; and (3) the protected speech was a substantial or motivating factor for the adverse employment action. *Id.*

### 1. Protected Speech

■ The first question—whether an employee engaged in constitutionally protected speech—is a question of law that requires some elaboration. In *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court rejected the position that public employees "may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with [their work]." Nonetheless, the Court recognized that there must be "a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

Therefore, two questions arise that we must consider when determining whether a public employee engaged in protected speech. First, as a threshold matter, we must decide whether the employee spoke as a "citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410,

418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). If so, we balance the employee's free speech interest against the employer's justifications for restricting the employee's speech. *Id.* Here, the district court properly concluded that Stinebaugh spoke as a citizen on a matter of public concern and that the justifications for the speech weighed in favor of Stinebaugh.

### a. Stinebaugh Engaged in Citizen Speech on a Matter of Public Concern.

The initial inquiry has two components: whether the topic was a matter of public concern and whether the employee was speaking as a citizen. The Supreme Court, in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), clarified what speech qualifies as a "matter of public concern." Employee speech is protected if the speech may be "fairly considered as relating to" issues "of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. By contrast, when employee speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to the speech without "intrusive oversight by the judiciary in the name of the First Amendment." *Id.*

In *Garcetti,* the Supreme Court explained the second component of the initial inquiry—whether an employee is speaking as a citizen. 547 U.S. at 421, 126 S.Ct. 1951. Although the plaintiff's speech in *Garcetti* involved a matter of public concern, the Supreme Court concluded that the employee was not engaged in constitutionally protected speech because "[t]he controlling factor" in that case was that the employee's "expressions were made *pursuant to* his duties as a calendar deputy"—making the government entity, not the employee, the relevant speaker. *Id.* (emphasis added). "But *Garcetti* said

nothing about speech that simply relates to public employment or concerns information learned in the course of public employment." *Lane v. Franks,* —— U.S. ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* As the Supreme Court recently explained, the focal point of *Garcetti* "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* Thus, if a public employee's speech ordinarily falls within the scope of his duties, he does not speak as a citizen for First Amendment purposes. *Id.; Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951. But where the speech ordinarily does not fall within the scope of the public employee's duties, he speaks in his role "as a citizen even if his speech involves the subject matter of his employment." *Boulton v. Swanson,* 795 F.3d 526, 534 (6th Cir.2015) (quoting *Dougherty v. Sch. Dist. of Phila.,* 772 F.3d 979, 990 (3d Cir.2014)). "After *Lane,* the *Garcetti* exception to First Amendment protection for speech … must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Id.*

In this case, Rains and Krites argue that Stinebaugh's speech does not involve a matter of public concern and therefore is not protected because it was merely an "employee beef." They rely on *Haynes v. City of Circleville,* 474 F.3d 357 (6th Cir. 2007), in which this court concluded the speech at issue was not a matter of public concern because it was nothing more than "the quintessential employee beef: management has acted incompetently." *Id.* at 365 (quoting *Barnes v. McDowell,* 848 F.2d 725, 735 (6th Cir.1988)).

We have found it "plainly illogical and contrary to the broader purposes of the First Amendment" to assert that "an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern." *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir.1997). The First Amendment protects "the public's interest in receiving informed opinion as [much as] the employee's own right to disseminate it." *Lane*, 134 S.Ct. at 2377 (quoting *San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam)). Consequently, we consider "the distinction between matters of public concern and those only of private interest, 'not [between] civic-minded motives and self-serving motives.'" *Mosholder v. Barnhardt*, 679 F.3d 443, 450 (6th Cir.2012) (quoting *Chappel*, 131 F.3d at 575). Exposing governmental inefficiency, mismanagement, or misappropriation of public money are matters "of considerable public significance," *Garcetti*, 547 U.S. at 425, 126 S.Ct. 1951; *Chappel*, 131 F.3d at 576, yet it is also critical to civic discourse that citizens and their leaders understand how increasing or decreasing government spending may affect public health or safety. *See Westmoreland v. Sutherland*, 662 F.3d 714, 719–20 (6th Cir.2011). *See also Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir.1999) (observing that speech concerning "the workings of the [city's] Fire Department and public safety" fell easily within matters of public concern).

Contrary to the defendants' argument, the content of Stinebaugh's speech related to a matter "of political, social, or other concern to the community," *Connick*, 461 U.S. at 146, 103 S.Ct. 1684 and was not a "quintessential employee beef." *See Haynes*, 474 F.3d at 365. Stinebaugh spoke to three council members to give them a citizen taxpayer's perspective on the fire department's plan to expend public money on a new rescue truck. *See Westmoreland*, 662 F.3d at 719–20; *Chappel*, 131 F.3d at 576; *see also Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir.2004) (noting that the Supreme Court in *Pickering* "held that the firing of a teacher for writing a letter to a newspaper, opposing a tax increase advocated by the defendant Board of Education, was a violation of the First Amendment because the issue was a matter of public concern"). We have no difficulty concluding that Stinebaugh's speech was on a matter of public concern.

Rains and Krites next argue that, even if Stinebaugh's comments involve a matter of public concern, Stinebaugh's speech is not constitutionally protected because his comments were made pursuant to his official duties. In support of their position, they rely on fire department standard operating guideline 2.6(23), which states that the fire "Captain participates in planning of all fire department goals and objectives."

We have identified several factors to consider when determining whether an employee's speech was made pursuant to his official duties, including "the impetus for h[is] speech, the setting of h[is] speech, the speech's audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir.2007). Other relevant, but not dispositive, factors include where the speech occurred—inside or outside of the workplace, *see Garcetti*, 547 U.S. at 420–21, 126 S.Ct. 1951 (observing that public employees "may receive First Amendment protection for expressions made at work")—and if the speech is ordinarily within the scope of the speaker's duties, *Lane*, 134 S.Ct. at 2379.

Here, the impetus for Stinebaugh's speech was to voice his opinion about how the City allocated its resources. His

speech did not involve the planning of the fire department's goals and objectives as Rains and Krites suggested. Nor was his speech transformed to employee speech because he learned through his position as Fire Captain the fire department's desire to purchase Unit 242. *See id.* at 2379 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.").

Two of the three council members testified that Stinebaugh expressly told them that he was contacting them as a taxpayer, not as an employee on behalf of the fire department. Additionally, the third council member testified that Stinebaugh made no reference to his employment with the fire department. Stinebaugh spoke to the three council members by telephone, not at the fire department. *See Garcetti,* 547 U.S. at 420–21, 126 S.Ct. 1951. Stinebaugh testified that he was at home when he spoke to the first council member, and he was not asked his location when he placed the calls to the other two council members.

In *Westmoreland,* we affirmed the district court's finding that the firefighter was speaking as a private citizen—and not pursuant to his official duties. 662 F.3d at 719. We noted that "[a]lthough plaintiff identified himself as a public employee, he appeared off duty, out of uniform, and at a public meeting to address the Mayor and City Council during the public comment period." *Id.* Furthermore, we held that "[n]othing in the record supports the claim that plaintiff's expression was made pursuant to a task that was within the scope of his official duties." *Id.; see, e.g., Weisbarth,* 499 F.3d at 544 (holding that statements to a consultant who was hired by the employer to evaluate workplace issues were within the scope of the employee's

official duties). Like the employee in *Westmoreland,* Stinebaugh was off duty, out of uniform and out of the office when he addressed the council members. Moreover, Stinebaugh identified himself twice as a citizen taxpayer and never identified himself as a public employee, making this an easier case than *Westmoreland.* Accordingly, Stinebaugh was speaking as a citizen on a matter of public concern.

### b. *Pickering* Balancing Test Tips in Favor of Stinebaugh.

Because Stinebaugh's comments involved citizen speech on a matter of public concern, we apply the *Pickering* balancing test to weigh "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. In *Pickering,* the Supreme Court evaluated the claim of a high school teacher who was fired by the Board of Education after he sent a letter to a local paper criticizing the school board's budgetary decisions. *Id.* at 564, 88 S.Ct. 1731. The Court held that the school board's interests did not outweigh the employee's desire to "contribute to public debate" like that of any other citizen. *Id.* at 572–73, 88 S.Ct. 1731.

On appeal, Rains and Krites argue that even if Stinebaugh engaged in citizen speech on a matter of public concern, his speech is not protected because the *Pickering* balancing test favors the City. In support of their position, they rely heavily on *Belcher v. City of McAlester,* 324 F.3d 1203 (10th Cir.2003). Rains and Krites argue that the present case is factually similar to *Belcher,* and in *Belcher,* the court concluded that the *Pickering* balancing test tipped in favor of the city. *Id.* at 1209. As an initial matter, *Belcher* is not

binding on this court. And even if it were, the case is distinguishable from the present case. Accordingly, Rains's and Krites's reliance on *Belcher* is misplaced.

Although *Belcher* is factually similar to the present case—in that the First Amendment claimant was a firefighter who spoke to and urged members of the city council not to purchase a new fire truck—it is distinguishable because the city had an administrative policy whereby "employees [we]re prohibited from contacting Council members except by addressing the Council at a public meeting." *Id.* at 1204–05. Additionally, the fire department rules and regulations provided that "contact of [a] legislative body without authorization in reference to operations or personnel of Municipal Government can be a basis for demotion, suspension, or dismissal." *Id.* at 1205 (internal quotation marks omitted).

When balancing the parties' respective interests, the court relied heavily on the fact that *Belcher* violated these two policies. *See id.* at 1208–09. Under all the circumstances presented, the Tenth Circuit concluded that the employee's interest in communicating privately with council members was outweighed by the employer's interest in directing communications through internal channels and, with prior authorization, to public meetings of the council in efforts to maintain harmony among fire department employees. *Id.*

When striking a balance between the parties' respective interests, we "consider whether an employee's comments meaningfully interfere with the performance of h[is] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.1994). Here,

Stinebaugh's comments did not interfere with the performance of his duties. After Stinebaugh spoke to the council members, he continued to serve as fire captain for roughly two months. Rains conceded that Stinebaugh's speech did not pose any health or safety risk to anyone in the fire department or to the city's citizens. Although Stinebaugh's comments might have led the city council to ask Rains and Krites additional questions to justify the purchase of Unit 242, Stinebaugh's speech did not prevent Rains and Krites from implementing their plan to purchase a new truck. In fact, the city council unanimously approved the purchase, and the fire department received the truck in 2013.

Rains and Krites do not offer evidence to show that Stinebaugh's speech interfered with the City's ability to deliver efficient fire and rescue services to the public or with city officials' ability to command the fire department. *See Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir.1986). Instead, they argue that fire departments are paramilitary organizations with a chain of command and a dependency on loyalty, trust and discipline to operate effectively. They cite several cases from other circuits suggesting that paramilitary organizations have an enhanced interest in regulating employee speech. We have previously held "that public safety employers [do not] have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests." *Mosholder*, 679 F.3d at 451. And where a public employee's speech "more substantially involve[s] matters of public concern" as here, the Supreme Court has cautioned that "a stronger showing [of government interests] may be necessary." *Lane*, 134 S.Ct. at 2381 (quoting *Connick*, 461 U.S. at 152, 103 S.Ct. 1684). Absent evidence that Stinebaugh's speech actually disrupted the delivery of public fire and

rescue services or evidence strongly demonstrating the city's interest in suppressing Stinebaugh's speech, the *Pickering* balancing test tips in favor of Stinebaugh. *See id.* at 2381.

Because the speech at issue concerned the expenditure of taxpayer money, Stinebaugh's interest in engaging in protected speech was a matter of significant public concern. *See Chappel*, 131 F.3d at 576. Comparatively, the City's interest in promoting the efficiency of public services is low because the defendants failed to produce strong evidence that Stinebaugh's speech had an adverse impact on the fire department's operations. Accordingly, we conclude that Stinebaugh's interests outweigh those of the City.

### 2. Stinebaugh Was Subject to an Adverse Employment Action.

Stinebaugh's demotion and subsequent termination are adverse employment actions, and the parties do not dispute this fact. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir.2012).

### 3. Questions of Fact Remain as to Whether the Protected Speech Was a Substantial or Motivating Factor for the Adverse Employment Action.

■ Appellants argue that Stinebaugh was demoted and later terminated because he initially lied and violated the chain of command. By contrast, Stinebaugh argues that he suffered adverse employment actions because of his speech. Thus, questions of fact remain why Stinebaugh was demoted and subsequently fired.

Because there are questions of fact surrounding Stinebaugh's demotion and termination, it follows that there are questions of fact as to whether the speech was a substantial or motivating factor for his demotion and termination.[2] Fed.R.Civ.P. 56(a). Additionally, viewing the facts in the light most favorable to Stinebaugh, he has established a *prima facie* case for First Amendment retaliation. Thus, Stinebaugh established the first prong of the qualified immunity analysis—that his First Amendment rights were violated. *See City of Elyria*, 502 F.3d at 491.

### B. Clearly Established Law.

"To determine whether a right was clearly established for purposes of qualified immunity, this court 'look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Chappel*, 131 F.3d at 579 (quoting *Williams*, 24 F.3d at 1533). This court has recognized that while it "must consider whether a reasonable official would have known that the particular

---

**2.** Without citing authority, Krites argues on appeal that, even if the district court properly denied qualified immunity to Rains, it erred when it denied him qualified immunity because Rains was the ultimate decisionmaker. This argument lacks merit. "[A]n influential recommender can be liable under § 1983 without being the final decisionmaker, if the recommendations are shown to be sufficiently influential." *Ward v. Athens City Bd. of Educ.*, No. 97–5967, 1999 WL 623730, at *8 (6th Cir. Aug. 11, 1999). There are questions of fact as to the extent of Krites's role in Stinebaugh's demotion and termination. First, it is undisputed that Krites recommended to Rains that Rains terminate Stinebaugh following the first disciplinary hearing. Rains opted for a less severe adverse employment action—demotion. Second, it is undisputed that Krites ordered Jackson to provide a written statement of the events that occurred at the library, which served as the basis for Stinebaugh's termination. Viewing the facts in the light most favorable to Stinebaugh, a reasonable jury could find that Krites played an influential role in Stinebaugh's demotion and termination and that his actions violated Stinebaugh's First Amendment rights.

conduct at issue violated clearly established law, it is not necessary to find that the particular conduct at issue ha[s] previously been held unlawful." *Id.* at 579–80 (internal citations omitted).

Rains and Krites argue that they are entitled to qualified immunity because reasonable officials could have believed that Stinebaugh's speech was not protected. We disagree.

■ The district court properly found that reasonable officials in Rains's and Krites's positions could not have believed their conduct was lawful given the state of the law as it existed at the time of the events giving rise to this action. *See id.* at 576. "All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern [if the *Pickering* balance tips in favor of the employee], and no reasonable public official understanding this charge could conclude that [Stinebaugh's] speech did not address such matters." *Id.* at 580. Likewise, it is clearly established in this circuit that an off-duty public employee who speaks to city council members about city expenditures may be a private citizen for First Amendment purposes, even if those comments involve expenditures by his own agency or department. *See Westmoreland,* 662 F.3d at 716–19 (holding that an off-duty firefighter was not speaking pursuant to his official duties when he spoke to city council members about funding for safety equipment and training for the fire department).

Thus, the district court properly denied qualified immunity.

## II.

The City also appeals the district court's denial of summary judgment on Stinebaugh's *Monell* claim. "[A]n order deny-ing summary judgment is not ordinarily a final, appealable decision." *Cate v. City of Rockwood,* 241 Fed.Appx. 231, 236 (6th Cir.2007) (quoting *Chesher v. Neyer,* 477 F.3d 784, 793 (6th Cir.2007)). Nevertheless, interlocutory appeals are available for the denial of qualified immunity. *See id.* When the denial of a motion for summary judgment on a *Monell* claim accompanies the denial of qualified immunity, however, we only have jurisdiction over the *Monell* claim if it is "inextricably intertwined" with the qualified immunity determination, making pendent appellate jurisdiction proper. *See McKenna v. City of Royal Oak,* 469 F.3d 559, 562–63 (6th Cir.2006).

Here, the City's potential *Monell* liability is not "inextricably intertwined" with Rains's and Krites's qualified immunity claim. In general, pendent appellate jurisdiction only applies to municipal liability issues when "the finding of nonexistence of a constitutional claim for [qualified] immunity purposes necessarily decide[s] the whole case not only in favor of the [individual defendant], but also in favor of the [municipality] as well...." *Cate,* 241 Fed. Appx. at 236 (quoting *Brennan v. Twp. of Northville,* 78 F.3d 1152, 1158 (6th Cir. 1996)). Therefore, because we affirmed the district court's denial of summary judgment to Rains and Krites on qualified immunity grounds, we lack jurisdiction over this claim. *See Cate,* 241 Fed.Appx. at 236–37.

## III.

For the reasons given above, we **AFFIRM** the district court's denial of summary judgment as to Rains's and Krites's qualified immunity claim and **DISMISS** for lack of jurisdiction the appeal of the district court's denial of summary judgment on Stinebaugh's claim against the City.

ROGERS, Circuit Judge, dissenting.

It is hard to imagine that the director of a small agency cannot implicitly expect one of his select principal subordinates, with whom the director has discussed a major policy proposal, to consult with the director before secretly contacting members of the decision-making body to oppose the proposal. The analysis in *Pickering* precludes such an anomalous result, at least— as in this case—where the subordinate is not alleging any wrongdoing or corruption. This case appears to involve the type of pure backstabbing that will destroy any close working relationship. The First Amendment does not protect such activity from adverse employment action.

Tom Stinebaugh's interest in speaking with three city council members about the purchase of a heavy rescue engine was plainly outweighed by the City's interest in promoting the efficiency of the Wapakoneta fire department. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). A contrary conclusion could only be reached by ignoring Stinebaugh's leadership position in the fire department, the internal channels through which he could have expressed his views, and the distrust and agitation among his colleagues that his comments engendered. Because Stinebaugh's speech is unprotected, Kendall Krites and William Rains are entitled to summary judgment on Stinebaugh's First Amendment retaliation claim.

Stinebaugh's leadership position within the department at the time of his comments weighs against him in the *Pickering* balancing analysis. In assessing the interests of the employer and the speaker, courts must consider "the responsibilities of the employee within the agency." *Rankin v. McPherson*, 483 U.S. 378, 390, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Employees—like Stinebaugh—who are in positions of "authority and public accountability" must generally exercise greater caution in speaking, since "the danger to [an] agency's successful functioning" is greater when a leader or policymaker airs his opinions to the public. *Id.* at 390–91, 107 S.Ct. 2891. Stinebaugh was a Fire Captain when he spoke with the council members. According to the department's standard operating guidelines, the Captain "is an important part of the department's management team and is responsible for the overall direction, coordination, and evaluation of [his] crew." Krites' deposition testimony that the Captain "carr[ies] out the organization, the plans, [and] the guidelines of the department" further underscores the Captain's leadership role in day-to-day operations.

These responsibilities make clear that Stinebaugh served a leadership and policy-making role rather than a role like that in *Rankin*, where the employee "serve[d] no confidential, policymaking, or public contact role." 483 U.S. at 390–91, 107 S.Ct. 2891. Stinebaugh's position—which was only below the Fire Chief in the chain of command—imbued his comments with a disruptive potential that would not typically accompany the comments of an employee serving in a clerical capacity. Stinebaugh's position therefore diminished his speech interest and strengthened the City's interest in regulating the manner in which Stinebaugh spoke. This distinguishes this case from cases like *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), which involved comments by a teacher who did not serve in an administrative capacity, and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), which involved comments by an employee whose job consisted of entering data into a computer.

Also undercutting Stinebaugh's claim is the fact that he could have easily expressed his concerns through internal channels. Doing so would have minimized disruption within the fire department at little cost to Stinebaugh. Government employees undoubtedly have an interest in questioning the wisdom of government expenditures. *See Garcetti v. Ceballos,* 547 U.S. 410, 425, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Pickering,* 391 U.S. at 572, 88 S.Ct. 1731. An employee's decision to comment on government spending does not, however, immunize his speech. This is because the balancing analysis requires courts to consider "the manner, time, and place of the employee's expression" in addition to the subject of the speech. *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. In considering this factor, other circuits have noted that an employee's failure to avail himself of less disruptive channels of communication before speaking to the public diminishes the protection that his speech enjoys. *See, e.g., Deschenie v. Bd. of Educ.,* 473 F.3d 1271, 1281 (10th Cir.2007); *Greer v. Amesqua,* 212 F.3d 358, 371–72 (7th Cir.2000); *Foster v. Ripley,* 645 F.2d 1142, 1149 (D.C.Cir.1981).

Stinebaugh had several internal channels at his disposal. He could have, for example, followed the chain of command and met with Chief Krites, his immediate supervisor. Besides the intuitive logic of this course of action, this is implicitly required by the department's guidelines, which provide for a "chain of command type structure" and require "[e]mployees . . . to strictly adhere to the chain of command." Stinebaugh could have also raised his concerns at the meeting in which Krites announced the proposal to buy the engine to all of the department's employees. Likewise, Stinebaugh could have communicated his views at any of the monthly staff meetings at which Krites, Stinebaugh, and two other captains discussed the operations of the department.

Finally, Stinebaugh's beef with the City's use of tax dollars was not the type of concern—such as, for instance, a suspicion about a superior's drinking on the job where the drinking could endanger others—that might be more appropriately raised outside the chain of command. Therefore, although the failure to use internal channels is not a per se bar to First Amendment protection, this weighs against holding that Stinebaugh's speech is protected.

The final consideration is that by circumventing Krites, Stinebaugh undermined the trust and harmony among colleagues that is especially important for firefighters. The Supreme Court has recognized the direct pertinence in *Pickering* balancing of "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891 (citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. 1731); *see also Williams v. Kentucky,* 24 F.3d 1526, 1536 (6th Cir.1994).

The record makes clear that Stinebaugh's private communications with the council members impaired harmony and trust within the department. For example, Krites asserted at his deposition that he considered Stinebaugh's actions to be "backstabbing," and "disrespectful [and dis]loyal to the department." Rains, the department's Safety Service Director, testified that Stinebaugh "had circumvented the chain of command and that is a grievous thing in a paramilitary organization." Tony Stinebaugh, Stinebaugh's brother, recognized that "there was a stir [in the department] over things that had happened with the engine and Tom," and that "things were brewing and . . . it was prob-

ably going to become an issue." Several other firefighters, including Alan McClintock, Don Wright, and Zach Heinfeld, also revealed during an investigation of the department that they were upset about the communications or felt that Stinebaugh's actions were wrong. These grumblings more than suffice to show that Stinebaugh's comments negatively impacted the discipline and morale in the work place.

The Tenth Circuit's persuasive analysis in *Belcher v. City of McAlester*, 324 F.3d 1203 (10th Cir.2003) is directly on point. In that case, a firefighter asked four members of the city council not to approve the purchase of a new fire engine. *Id.* at 1205. Like Stinebaugh, Belcher did not raise his concerns about the purchase with his superiors, and like Stinebaugh, Belcher was disciplined for his speech. *Id.* at 1205–06. In holding that Belcher's speech was not protected, the court observed that Belcher could have easily voiced his concerns internally, the policies of the city and the fire department required Belcher to refrain from contacting city council members, and Belcher's speech caused "actual disruption" among firefighters. *Id.* at 1208–09.

The reasoning in *Belcher* is sound. Fire chiefs must be able to expect that the leaders of their department will be "team players." The trust and harmony essential to the relationships among firefighters requires employers to have a means of reprimanding a captain who secretly circumvents the chain of command to criticize a proposal about the use of departmental resources. It makes no difference that the city in *Belcher* had an express policy of prohibiting employees from contacting council members and that the fire department had a rule prohibiting a firefighter's unauthorized contact with a legislative body, because Stinebaugh's communications were subject to similar restrictions. Such a policy would be implicit in any close working arrangement between an adminis-

trator and his small group of immediate subordinates with whom he consults on policy.

In any event, as an employee, Stinebaugh was expected "to use the chain of command upward, downward, and laterally." The department's guidelines also required Stinebaugh, as a Captain, to be "involved in management, planning and problem solving activities for the department" and to "fully utilize the chain of command." Even if the guidelines do not specifically forbid firefighters from talking with council members without prior approval, a 2001 letter from a former Fire Chief to Stinebaugh—which reprimanded Stinebaugh for talking to council members without the Chief's approval—makes clear that this was the department's policy. Like the restrictions in *Belcher*, the fire department's policies served to channel communications about department affairs in a way that minimizes workplace disruption.

The district court should have entered summary judgment for the defendants.