NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0738n.06

No. 12-6250

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 08, 2013*
DEBORAH S. HUNT, Clerk

MELINDA KEELING,                                     )
                                                     )          ON APPEAL FROM THE
          Plaintiff-Appellant,                       )          UNITED STATES DISTRICT
                                                     )          COURT FOR THE EASTERN
v.                                                   )          DISTRICT OF TENNESSEE
                                                     )
COFFEE COUNTY, TENNESSEE;                            )                O P I N I O N
GLENN DARDEN,                                        )
                                                     )
          Defendants-Appellees.                      )
                                                     )

BEFORE:  McKEAGUE and DONALD, Circuit Judges; and LAWSON, District Judge.[*]

     **McKEAGUE, Circuit Judge.**  Plaintiff-appellant Melinda Keeling was the Permits Clerk

in the Coffee County Codes Department.  Glenn Darden was her direct supervisor from September

2009 to May 2010.  On November 12, 2009, several members of the public, who had previously

come to the Codes Department seeking Darden's assistance only to find him absent, again came

looking for him. He was absent yet again.  When the last two people complained, Keeling escorted

them to the mayor's office, where she told the mayor "what was going on."

     The district court determined that a subsequent letter sent to the mayor by Keeling did not

touch upon a matter of public concern but failed to consider whether Keeling's words and actions

on November 12, 2009, were protected under the First Amendment.  Much of her brief is spent

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of
Michigan, sitting by designation.

quibbling with many of the district court's characterizations of the facts, but the crux of her appeal concerns the events of November 12, 2009, and whether on that date she spoke as a citizen on a matter of public concern.

Keeling needed to establish two things to show that she engaged in protected speech: (1) that she spoke as a citizen and (2) that her speech touched upon a matter of public concern. The district court based its decision on the second prong but never addressed the question of whether Keeling spoke as a citizen. We take a different path and conclude that Keeling was not speaking as a citizen. Because the first prong is dispositive, we never reach the second. We therefore affirm.

**I.**

**A.**

In 2007, Ronnie Branch, Keeling's supervisor at the time, hired Darden as an inspector for the Codes Department. From the outset, Keeling believed that Darden and Branch should have made themselves more readily available to the members of the public who frequently came to the office asking questions that Keeling was unqualified to answer—Keeling was not permitted to answer many of the questions asked by these people because she did not have a state license. When Keeling told Darden that someone had come to see him, he would respond by telling her that those people needed to come to the office when he was there. At some point, Keeling suggested that Darden change his schedule in one of three ways in an attempt to better accommodate people who came to the office seeking his assistance. First, she suggested that Darden work half a day in the field and half a day in the office. Second, she suggested that Darden allow her to make appointments for him.

Third, she suggested that Darden work in the field three days a week and work in the office two days a week. Darden rejected all three proposals.

In September 2009, Branch resigned and Darden became the Codes Department's new administrator, making him Keeling's direct supervisor.

Keeling claims that Darden's absences continued after he became the administrator, and on November 12, 2009, during one of his absences, four people came to the office seeking his assistance. All of them had come looking for Darden on at least one prior occasion, only to find him absent. Keeling, unable to help these people herself, escorted the last two individuals to the mayor's office, where she explained the situation by stating "what was going on," first to the mayor's assistant and then to the mayor. It is this speech that Keeling contends touches upon a matter of public concern. Although the most important fact in this case, the specific content of her speech is not in the record. Keeling returned to her office and soon went to lunch.

Darden returned while Keeling was at lunch and learned what had transpired in the mayor's office. When Keeling came back, Darden called her into his office. She claims that his face was red and his eyes unusually bloodshot. Darden then shook a pencil in her face "and very loudly threatened 'If you ever take someone to the mayor's office to complain, I'll write you up.'" He followed up this threat with another: "If you ever hand me an incomplete application, I will write you up." According to Keeling, Darden was complaining about an incomplete application that Keeling had left on her desk while she went to lunch.

On November 16, Keeling wrote a letter to the mayor. The letter was a "formal complaint against . . . Darden." She stated that she felt "improperly threatened with disciplinary action and

harassed by Mr. Darden's unprofessional words and actions in violation of [her] rights under Coffee County Manual Equal Opportunity Policy." She also alleged that Darden's conduct violated the Coffee County Personnel Harassment Policy.

She stated that she had two main points of concern "leading up to the incident." First, Darden was unwilling to make appointments and to keep regular office hours. Second, Darden had changed the department policy regarding new applications: He would only review completed applications, but people would not complete the applications until they knew the costs, which required them to speak with Darden, who was frequently unavailable. The letter then detailed the events of November 12 as follows:

> These four taxpayers were making it very clear to me by their words and non-verbal communication that they were upset. Previous to this incident, accepted procedure was that such concerns were brought to the mayor's attention. I was concerned with these customers' very valid complaints and led the two men into the Mayor's office. I explained the situation to [the mayor's assistant] who told me to step into the Mayor's office and tell him. I told Mayor Pennington, and Mayor Pennington told [his assistant] to call [Darden]. I then went back to performing my duties . . . .

*Id.* She then recounted her November 12 altercation with Darden. She added that she had tried to improve the customer service of the Codes Department by helping Darden become more available to the public, but Darden had refused her assistance. She ended the letter by stating that she expected that such altercations would not occur in the future, that she hoped that she and Mr. Darden could "return to serving the citizens of Coffee County in the manner which they deserve and as our Coffee County Personnel Manual requires," and that she believed that procedural changes were needed to better accommodate the citizenry.

According to Keeling, on November 18, Darden presented her with a written reprimand, dated November 16. The reprimand was based upon her submission of incomplete applications. The letter rebuked Keeling for not completing applications "in their entirety," and referred to the events of November 12. The reprimand ended by stating that the letter would be put in Keeling's personnel file for a year.

The series of events that unfolded thereafter exhibit the further degradation of Darden and Keeling's relationship. Keeling wrote a letter to the mayor, which resulted in the reprimand being removed from her personnel file. Darden drafted new Codes' Department Policies, which Keeling found unsatisfactory. Keeling wrote a number of subsequent letters to the mayor; Darden attempted to eliminate the Deputy Clerk's position effective January 6, 2010; and Keeling allegedly overheard Darden telling another man that Darden was trying to get her fired. For purposes of this appeal, however, these events are largely irrelevant because they do not help answer the question of whether Keeling spoke as a citizen upon a matter of public concern when she went to the mayor on November 12, 2009. On May 27, 2010, Darden informed Keeling via letter that her position was terminated because of budget constraints and a lack of sufficient funding.

**B.**

Keeling sued. Counts I and II—against Coffee County and Darden, respectively—alleged federal claims based on 42 U.S.C. § 1983. She argued that she was retaliated against for speaking on a matter of public concern, in violation of the First Amendment. Counts III and IV alleged state law claims, not at issue in this appeal.

No. 12-6250
*Keeling v. Coffee County, Tenn., et al.*

The district court granted defendants' motion for summary judgment on the federal-law claims, and refused to exercise supplemental jurisdiction over the remaining state-law claims. The district court determined that Keeling's November 16 letter did not address a matter of public concern and therefore did not raise a cognizable claim under the First Amendment. The district court did not analyze whether Keeling spoke as a citizen on a matter of public concern on November 12, 2009.

## II.

We review the district court's grant of summary judgment *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this appeal, Keeling raises two primary arguments.[1] First, Keeling alleges that the district court erred in eight of its factual findings and that these errors show a bias in favor of the defendants. Her arguments are wholly lacking in merit and are not relevant to our decision, and we will not address them.

We therefore proceed to her second argument and the main thrust of her appeal—whether Keeling offered sufficient evidence to show that she engaged in protected speech. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen

---

[1]Keeling also argues that whether speech touches upon a matter of public concern is a question of fact. However, this court is bound by its prior precedents saying otherwise. *See, e.g.*, *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 543 (6th Cir. 2012).

- 6 -

addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also*

*Farhat v. Jopke*, 370 F.3d at 588 (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)). As

a public employee trying to prove that she engaged in protected speech, Keeling needed to clear two

initial hurdles: first, she needed to show that she was speaking as a citizen (as opposed to as an

employee pursuant to her official duties); second, she needed to show that the content of her speech

touched upon a matter of public concern. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488,

2493 (2011). Keeling failed to clear the first hurdle, so we do not reach the second.[2]

If a public employee speaks pursuant to her official duties, then she was not speaking as a

citizen, and the First Amendment will "not insulate [her] communications from employer

discipline." *Garcetti*, 547 U.S. at 421. To put it another way, if the employee's speech "owes its

existence to an employee's professional responsibilities," the employee will not be entitled to First

Amendment protections.

When reviewing whether a public employee spoke as a citizen, we must assess both the

speech's "content and context—including to whom the statement was made—to determine whether

the plaintiff made the statement pursuant to her individual duties." *Fox v. Traverse City Area Public

Schools Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010). We have suggested "'that when a public

employee raises complaints or concerns up the chain of command at his workplace about his job

duties, that speech is undertaken in the course of performing his job.'" *Id.* (quoting *Davis v.*

---

[2]Though the district court decided this case by finding that Keeling's November 16 letter to the mayor did not touch upon a matter of public concern, we may affirm on any grounds supported by the record. *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011).

*McKinney,* 518 F.3d 304, 313 (5th Cir. 2008)).  We examine the "impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter."  *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012) (internal quotation marks omitted).  We also consider whether the speech is nothing more than a public employee complaint against a supervisor.  *Id.* at 540-41.  Against this backdrop, we conclude that Keeling was not speaking as a citizen based on the context and general content of the speech and the absence of the specific content of her speech in the record.

**A.**

The context and general content of the speech suggests that she was speaking as a public employee and not as a citizen.  Most importantly, her speech pertained to her employment—her and her supervisor's ability to properly assist members of the public who came to the Codes Department—and was made up the chain of command.  *Id.* at 350.  She also made the statements inside the work place, and by her own admission, she was acting pursuant to "accepted procedure."[3]

Her November 16, 2009, letter also points toward her speech being that of an employee. Although it exhibits concern for the service of citizens, it is mainly concerned with how Darden managed the Codes Department.  As the district court determined, the letter reads as a complaint by an employee against a supervisor, not a complaint written by a citizen.  Keeling does not contest this.

---

[3]The procedure is not contained in any policy manual or personnel handbook.  Instead, it appears to have been a procedure adopted by the mayor and known by employees.  Notwithstanding whether the procedure was memorialized in a manual or handbook, acting pursuant to an organization's accepted procedure for employee complaints tends to suggest that the person was acting pursuant to her job duties.

The fact that the letter—written shortly after Keeling went to the mayor's office—focuses on her own ongoing complaints about a supervisor, and not the complaints of a citizen, contextually supports finding that she was speaking as a public employee and not as a citizen because the letter suggests her earlier speech was "nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Haynes v. City of Circleville,* 474 F.3d 357, 365 (6th Cir. 2007) (quoting *Barnes v. McDowell,* 848 F.2d 725, 735 (6th Cir. 1988)).[4]

At first glance two facts weigh in her favor. First, her complaint was not to her immediate supervisor. *See Handy-Clay*, 695 F.3d at 542. But the complaint was made to a supervisor, and it was not made to her immediate supervisor presumably because the complaint was against him. The mere fact that she made the statements in front of two members of the public does not change anything. Second, the impetus for the speech did not come from a supervisor. *Id.* In the present case, the impetus for her speech was the complaints of public citizens. But in some ways, this fact weighs against her claim—the record indicates she engaged in the conduct because she was an employee following what she believed to be the "accepted procedure" for lodging complaints.

---

[4]At oral argument, the plaintiff argued that her speech was an extraordinary communication, and not an everyday communication. It would seem to be somewhere in between the two. On the one hand, it may be true that Keeling at no other time took members of the public to the mayor's office in this way, suggesting that this was an extraordinary communication. However, on the other hand, this was the accepted procedure for lodging complaints. Her speech was arguably an "everyday communication"—whenever Keeling had a complaint against Branch, when he was the supervisor, or Darden thereafter, she "went to the mayor and expressed that to the mayor." The factor does not weigh heavily either in favor of or against a finding that Keeling spoke as a citizen.

Our conclusion is solidified by the factually analogous cases of *Weisbarth v. Geauga Park Dist.* and *Weintraub v. Board of Educ. of City School Dist. of New York*. In *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007), a park ranger spoke with an independent investigator regarding the operation of the department. In light of the park ranger's comments to the investigator, she was fired. *See id.* at 540. She argued that she had acted as a citizen, but we disagreed. True, speaking with the investigator was not part of her job description, but her speech "'owe[d] its existence to [her] professional responsibilities.'" *Id.* at 544 (quoting *Garcetti*, 547 U.S. at 411). Because such activities were conducted "as part of [her] professional responsibilities," she was acting as a public employee and not a citizen. *Id.* (internal citations omitted). We found she was not speaking as a citizen, even though she spoke to someone outside her chain of command. We noted that even though it may be "illogical or unfair" to ask someone to speak and then punish them for speaking, "the relevant question is whether the firing violated her free-speech rights under the First Amendment." *Id.* at 545. We found that the firing did not violate her rights.

In *Weintraub*, the Second Circuit held that "speech can be 'pursuant to' a public employee's official job duties even though it was not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub v. Board of Educ. of City School Dist. of New York*, 593 F.3d 196, 203 (2d Cir. 2010); *see also Davis*, 518 F.3d at 313. In *Weintraub*, a teacher alleged that he was retaliated against for filing a formal grievance with his union challenging the assistant principal's decision not to discipline a student who had thrown a book at the teacher. *Id.* The court determined that the teacher was speaking as a public employee even though his speech was not made pursuant to a duty detailed in his job description or made in response to a request from

his employer: The filing of the grievance was part-and-parcel to his job responsibilities—maintaining classroom discipline—because it went to his ability to execute his job. Therefore, he was not speaking as a citizen. *Id.*

Similar to the speech in these two cases, even if Keeling's speech was not required by her employment or set forth in her employment duties, the speech still owed its existence to her duties as a public employee. *Weintraub*, 593 F.3d at 203. The record leaves no doubt that she would not have spoken to the mayor but for her employment at the Codes Department—she met with and spoke to the mayor because of complaints made against her supervisor, while she was at work, pursuant to the accepted procedure. As in *Weintraub*, her concerns were part-and-parcel of her ability to carry out her duties—with Darden absent, she could not effectively serve the members of the public who came to the Codes Department. Indeed, there is nothing in the record that would support a finding that her speech was independent of her employment; the facts instead suggest that she was taking these people to the mayor in her capacity as a public employee. Examining the context of her speech, we conclude that Keeling was speaking as an employee and not as a citizen.

**B.**

Keeling failed to offer evidence establishing the specific content of her speech. But she argues that from vague generalizations of what she said to the mayor, we must infer that she was speaking as a citizen.

We disagree. If there were a factual dispute over what she actually said—Keeling alleged she said something that indicated she spoke as a citizen and defendants alleged she said something different that would not support a finding that she spoke as a citizen—then the issue should be

submitted to a jury. But this scenario is distinct from the current one where the record is devoid of evidence showing the specific content of Keeling's speech.

Where, as here, the context surrounding her speech supports a finding that she was not speaking as a citizen and the specific content of the speech is absent from the record, Keeling may not rely on vague generalizations to create a factual issue. *Cf. Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123-24 (7th Cir. 2009) (holding, in assessing whether speech touches upon a matter of public concern, that a First Amendment retaliation claim failed as a matter of law where the plaintiff failed to show the specific content of the speech and where the context and form of the speech were unknown). In the absence of the specific content of her speech, we are left with the context and general content, which indicates that she was not speaking as a citizen. Appellees were entitled to rely on the absence of the specific content of Keeling's speech in tandem with the context and general content of the speech to support their motion for summary judgment. Keeling then bore the burden to bring forth sufficient evidence to support a finding that she spoke as a citizen. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009). She failed to offer such evidence. We therefore conclude that Keeling's speech owed its existence to her employment and she spoke as a public employee and not as a citizen.[5]

---

[5]Keeling also alleges that her "associational activities"—associating with and escorting two members of the public to the mayor's office—were conducted by her as a citizen and touched upon a matter of public concern. Keeling failed to raise this argument below and therefore forfeited it. But even if she had raised the argument, it would fail for the same reasons as her speech claim—it is clear that she was associating with these people as an employee. She took the two men to the mayor's office while on duty, during work hours, and pursuant to accepted procedure. She was associating with these people only because she was working at the Codes Department.

**III.**

We do not condone the actions of appellees that led to this litigation. It is illogical and unfair to create an open-door policy and then slam the door shut against a person who utilizes it. But inequity does not transform unprotected speech into protected speech. There being no genuine issue of material fact, summary judgment was properly granted. We therefore **AFFIRM**.