NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0481n.06

Case No. 15-4334

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 17, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JONAH HOLBROOK, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| STEPHANIE DUMAS, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | O P I N I O N |

BEFORE: BATCHELDER, MOORE, and McKEAGUE, Circuit Judges.

McKEAGUE, Circuit Judge. Plaintiff Jonah Holbrook, former Village of Lincoln Heights Fire Chief, was fired after alerting firefighters to the potential closure of the fire department and the attendant loss of their jobs. Holbrook sued Village Manager Stephanie Dumas, alleging he was wrongfully discharged in violation of his right to freedom of speech. The district court dismissed the claim, holding that the speech related to personnel matters within the department, not a matter of public concern that would have enjoyed First Amendment protection. Finding no error, we affirm.

I

The relevant facts are largely undisputed. On July 22, 2014, Lincoln Heights Village Manager Stephanie Dumas received a letter from the Administrator of the Public Entities Pool of Ohio advising that the Village's liability insurance coverage would be terminated effective

October 2, 2014. R. 22-1, York Risk Pooling Letter, Page ID 213. Termination was due to the number of claims made against the Village in the prior fourteen years and the amount of losses covered under the contract, totaling $1,282,815, which far exceeded the total premium contributions made by the Village during the same period, amounting to $692,920.

On July 25, 2014, Dumas met with Holbrook in her office and discussed the possible cancellation of insurance coverage for the Village. R. 19-1, Holbrook Dep. at 30–33, Page ID 121; R. 20-1, Dumas Answers to Requests for Admissions No. 5, Page ID 162. She told Holbrook that the Village would try to obtain other insurance, but implied that absent insurance, the Village would not be able to run the police and fire departments. R. 19-1, Holbrook Dep. at 34, Page ID 122.[1] Later that day, Dumas e-mailed a copy of the notice of insurance cancellation to certain Village officials, including Holbrook, the Mayor, Police Chief, and elected Council members, saying simply she would "talk more on Monday." R. 19-1 Ex. E, Dumas E-mail 7/25/14, Page ID 148. The next day, Holbrook forwarded the e-mail, with notice of insurance cancellation attached, to employees in his department with the following note:

> PLEASE TAKE THE TIME TO READ THE ATTACHED LETTER!! IF THE VILLAGE DOES NOT FIND ANOTHER INSURANCE CARRIER, WE COULD POTENTIALLY BE OUT OF A JOB, PER THE CONVERSATION I HAD WITH MS. DUMAS ON FRIDAY 7/25/14.
>
> PLEASE CALL ME OR EMAIL WITH ANY QUESTIONS. IF YOUR [sic] AVAILABLE ON MONDAY 7/28/14 AT 6:30PM, PLEASE COME TO THE COUNCIL MEETING!!
>
> THANKS
>
> Jonah W. Holbrook
> Fire Chief

R. 19-1 Ex. E, Holbrook E-mail 7/26/14, Page ID 148 (emphasis in original).

---

[1] Dumas denied saying the Village might be forced to close the fire department. R.20-1, Dumas Answers No. 6, Page ID 162.

The matter of insurance coverage came up at the regularly scheduled Village Council meeting Monday, July 28, but the minutes show that it received little attention. Dumas announced that the Village's current coverage was being terminated "due to the number of law suits since 2000" despite "the changes and improvements we have made in the areas of public safety and hiring and firing of employees." R.19-1 Ex. D, Minutes at 3, Page ID 142. She reported that the Village has until October 2, 2014 to "find another company that will cover us." *Id.* The minutes do not reflect that any controversy ensued.

On July 31, Holbrook posted the following message on his Facebook page:

> To all of the current/past employees and those who support the fire department. As some of you may know, the fire department, police department and maintenance department are in jeopardy. Due to insurance related issues that were made public at last Monday's (7/28) council meeting. Council has the meetings recorded by video and there is online access, but I do not know the site. As of now, there is a chance the departments will face even more severe issues, as of October 2nd, 2014 if they cannot find another insurance company.

R. 19-1 Ex B., Holbrook Answers to Dumas No. 4, Page ID 137. He also spoke about the subject with a friend or colleague who was the chief or assistant chief of a neighboring fire department. *See* R.19-1, Holbrook Dep. at 62, Page ID 129; R.19-1 Ex. B, Holbrook Answers to Dumas No. 2, Page ID 137; R. 22-8, Holbrook Aff. at ¶ 13, Page ID 237.

On August 5, Holbrook met with Dumas in her office. She asked whether he had forwarded the notice of insurance cancellation to fire department employees. When Holbrook freely admitted that he had, Dumas told him she would request an explanation in writing and would then be asking for his resignation. R. 22-8, Holbrook Aff. at ¶7, Page ID 236. Holbrook was surprised she was upset. R. 19-1, Holbrook Dep. at 44–45, Page ID 124. He thought she forwarded the information to him so that he, as Fire Chief, could alert the employees to the situation. *Id.* On August 8, Holbrook submitted his written answers to Dumas's questions about

how and with whom he had shared the insurance information. R. 19-1 Ex. B, Holbrook Answers, Page ID 137.

On August 12, Holbrook received a letter from Dumas by certified mail informing him that he was suspended, with pay, effective August 11. Dumas then notified him by telephone on August 15 that he was terminated. This was followed by a letter from Dumas dated August 26, 2014, setting forth the reasons for the termination. R. 19-1 Ex. F, Termination Letter, Page ID 152. Of the five reasons listed, three relate to Holbrook's communications regarding the insurance situation: the July 26 text (e-mail) message to fire department employees, the Facebook posting, and the conversation with the chief of a neighboring fire department.[2] The letter characterizes Holbrook's conduct as "disruptive activity," "insubordination," "unauthorized disclosure," and "unsatisfactory performance." *Id.* Just over a month later, Holbrook commenced this action, filing a one-count complaint under 42 U.S.C. § 1983, alleging Dumas unlawfully retaliated against him for exercising his freedom to speak about an issue of public concern. R. 1, Complaint at 3, Page ID 3.

After completion of discovery and briefing on cross-motions for summary judgment, the district court granted Dumas's motion and denied Holbrook's. In an eighteen-page opinion, the district court explained why "the content and context of [Holbrook's] email and Facebook post lead to the clear conclusion that he was speaking to his employees on a personnel issue, and not on a matter of public concern." R. 29, Order at 15, Page ID 322. Further, the court observed that even if Holbrook's speech were deemed to relate to a matter of public concern, the Village's

---

[2] While the termination letter refers to a discussion Holbrook had with "Chief" of the Wyoming Fire Department, Holbrook's affidavit explains that the conversation referred to was with a personal friend of his, Matt Flager, Assistant Fire Chief of the Wyoming Fire Department. R. 22-8, Holbrook Aff. at ¶ 13, Page ID 237. This clarification is not disputed and the discrepancy is immaterial to the legal analysis. The discussion is hereinafter referred to as the "assistant chief conversation."

interests in promoting efficiency in serving the public, and in promoting morale among and retaining employees, justified the infringement of Holbrook's freedom of speech. *Id*. at 15–16, Page ID 322–23. Finally, the court noted that even if Holbrook's speech were deemed protected and the infringement unjustified, Dumas would nonetheless be entitled to qualified immunity because the governing law has not clearly established "that Holbrook had a constitutional right to circulate an alarming email message to his employees, suggesting that they could soon lose their jobs." *Id*. at 17, Page ID 324.

On appeal, the parties' briefing focuses primarily on a threshold issue: whether Holbrook's speech, and particularly the July 26 e-mail, which undisputedly played a motivating role in the decision to discharge him, represented speech by him as a citizen on a matter of public concern.

## II

### A. Standard of Review

We review the summary judgment ruling de novo. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Under Rule 56, summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Smith*, 708 F.3d at 825. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Id*. A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary

judgment.  *Sierra Club v. ICG Hazard*, 781 F.3d 281, 284 (6th Cir. 2015).  A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law.  *Crouch v. Honeywell Int'l, Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

### B.  Governing Law

The governing substantive law has been set forth in a handful of recent Supreme Court opinions.  It is well established that public employees do not surrender their constitutional rights as a condition of employment.  *Lane v. Franks*, 134 S.Ct. 2369, 2377 (2014).  On the other hand, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  While public employees retain certain rights under the First Amendment, "it does not empower them to 'constitutionalize the employee grievance.'"  *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).  The tension between these competing interests has given rise to a balancing framework that has been distilled into a two-step inquiry:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (citations omitted).

The first element in the two-step inquiry consists of two distinct components:  "whether the employee was speaking as a citizen *and* whether the topic was a matter of public concern." *Boulton v. Swanson*, 795 F.3d 526, 531–32 (6th Cir. 2015) (citing *Connick v. Myers*, 461 U.S. 138 (1983) (emphasis added)).  "Whereas speech *as a citizen may* trigger protection, . . . 'when

public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Lane*, 134 S.Ct. at 2378 (quoting *Garcetti*, 547 U.S. at 421) (emphasis added). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S.Ct. 2379. If the employee spoke pursuant to his official duties, he did not speak as a citizen and it is immaterial whether his speech addressed a matter of public concern. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007) ("*Garcetti* stands for the proposition that even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties.").

Speech involves a matter of public concern only when it may be fairly considered as relating to issues of "political, social, or other concern to the community." *Connick*, 461 U.S. at 146. When a public employee speaks as "an employee upon matters only of personal interest," the communication is not protected under the First Amendment. *Id.* at 147.

Finally, whether an employee's speech is protected as that of a citizen on a matter of public concern is a question of law to be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48 n. 7.[3]

---

[3] Some circuits have begun to treat the protected status of speech as a mixed question of fact and law, but the Sixth Circuit has continued to treat it as a question of law. *See Fox v. Traverse Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350–51 (6th Cir. 2010). Here, treatment of the issue as a matter of law is entirely appropriate in any event because the facts material to the nature and status of Holbrook's speech are undisputed. *See Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) (treating protected nature of speech as question of law where there was no factual dispute regarding what was said).

### C. Speech as Citizen

#### 1. *What Speech Matters?*

Although the termination letter Holbrook received cites three speech-based grounds for the decision—i.e., the July 26 e-mail, the Facebook post, and Holbrook's conversation with the assistant chief of a neighboring fire department—the district court's ruling and the parties' briefing below and on appeal have focused *primarily* on Holbrook's July 26 e-mail to fire department employees. It was this correspondence that evidently triggered Dumas's ire—written in "all caps" with multiple exclamation points, informing employees that "we could potentially be out of a job" because closure of the fire department could be imminent, urging employees to attend the next Village Council meeting, and accompanied by the notice of insurance cancellation . . . *even before* Village leaders discussed the significance of the notice at the July 28 Village Council meeting. Of the three speech-based grounds included in the termination letter, Dumas ostensibly knew only about the July 26 e-mail correspondence when, on August 5, Dumas told Holbrook she would be asking for his resignation after he admitted communicating the potential loss of jobs to employees. R. 22-8, Holbrook Aff. at ¶ 7, Page ID 236. It was this correspondence that Dumas has characterized in her briefing as sensationalized and alarmist, inciting panic among employees, hurting morale, and inducing some to leave the department. It was this correspondence, more than the others, that fits the termination letter description of Holbrook's "violation" as "disruptive activity in the workplace," and "insubordination and other disrespectful conduct," and "unauthorized disclosure of confidential information" and "unsatisfactory performance or conduct." R. 19-1 Ex. F, Termination Letter, Page ID 152.

In his appellate briefing, however, Holbrook has taken a somewhat different tack. He has attempted to blur the focus by relying more heavily on the later communications as speech-based

grounds for his termination. He argues that Dumas's reference to these communications in the termination letter—i.e., communications directed to non-employees—indicates he was disciplined in part due to speech that was not strictly intra-departmental, speech that was not pursuant to his official duties, speech that was "as a citizen."

The district court did not address this argument—and for good reason. Review of the briefing on both motions for summary judgment reveals that the argument was not addressed to the district court. That is, the summary judgment briefing reflects the parties' mutual understanding that the principal speech-based reason for termination was the July 26 e-mail. Holbrook's attempt to now attack the district court ruling based on arguments not presented below is improper and entitled to no consideration on appeal. *See Hayward v. Cleveland Clinic Foundation*, 759 F.3d 601, 614–15 (6th Cir. 2014) (argument not raised below deemed waived unless plain miscarriage of justice would result). Moreover, as detailed below, careful review of the totality of the circumstances reveals why the July 26 e-mail was the focus below and why we need not address the newly asserted role of the later communications to avoid a miscarriage of justice.

Yes, the termination letter mentions the Facebook message—addressed to current and past employees and those who support the fire department—and Holbrook's assistant chief conversation. By the time Holbrook had disclosed the Facebook post and the assistant chief conversation in his August 8 answers to Dumas, however, the notice of insurance cancellation had already been made public, by Dumas herself, at the July 28 Village Council meeting.[4] The subsequent communications can hardly have provoked Dumas, as they disclosed nothing more than she had already disclosed herself. The impact of Holbrook's later communications thus

---

[4]In fact, according to Holbrook's Facebook posting, the Village made a video recording of the Village Council meeting available on-line.

appears to have been redundant of the impact of the July 26 e-mail, which is clearly what provoked Dumas. And apart from their nominal inclusion in the termination letter, the record is devoid of evidence—from either side—supporting the notion that either of these communications played a motivating role in the termination decision. Instead, the record evidence is decidedly to the contrary.

As indicated above, Holbrook's affidavit avers that Dumas said she would ask for his resignation on August 5, immediately after he admitted sending the July 26 e-mail to employees, ostensibly before she knew anything about the later communications. Within days, Holbrook sent a letter of formal complaint to Village Mayor LaVerne Mitchell, objecting to the unfairness of Dumas's anticipated request for his resignation. R. 19-1 Ex. C, Letter to Mayor, Page ID 139. In his protestations to the Mayor, Holbrook complained that he was being punished for telling the employees about the insurance letter and the consequent threat to their employment, information he thought they had a right to know about, and information he thought he, as "Chief," had a duty to communicate to his employees. Further, Holbrook's deposition testimony, given eight months later, demonstrates that he continued to believe, unequivocally, that this was the reason for his termination. That is, he believed, "absolutely," that he was retaliated against *because he told employees* about the insurance problem. R.19-1, Holbrook Dep. at 63, 66, Page ID 129–30. This "violation" was accomplished by the July 26 e-mail.

Given the extant record, the conclusion is practically inescapable that Dumas included the later two communications in the termination letter, communications addressed to non-employees, simply to buttress the *real* reason for her decision, her disapproval of the July 26 e-mail. It was clearly the alarmist July 26 e-mail to the firefighters personally that could be reasonably perceived by Dumas as an "unauthorized disclosure," as "insubordinate and

disrespectful," and as "disruptive in the work place." This was almost certainly the predominant trigger of Dumas's strong reaction. Indeed, Holbrook readily admitted in deposition that employees' knowledge of the insurance problem and the threat to their jobs affected morale and contributed to attrition in the fire department. R. 19-1, Holbrook Dep. at 40, Page ID 123. Thus, even if Holbrook's new reliance on the Facebook post and assistant chief conversation were considered, the conclusion that Holbrook was fired for sending the July 26 e-mail, as Fire Chief, to his employees, enjoys far more support in the record than any other conclusion. The inclusion of the later communications in the termination letter amounts to no more than a scintilla of evidence supporting the newly asserted notion that Holbrook's communications with non-employees actually precipitated his firing. Any mischief perceived to have been done by the later communications would appear to have been redundant of, and wholly incidental to, the actual moving cause of Dumas's decision.[5]

Hence, the threshold question whether Holbrook engaged in speech as a citizen on a matter of public concern is rightly focused on the July 26 e-mail communication.

### 2. *July 26 E-mail*

Dumas argues, and the district court concluded, that the July 26 e-mail was sent by Holbrook not as a private citizen, but as an employee pursuant to his official duties. In support, the district court cited several circumstances. R. 29, Order at 10, Page ID 317. First, Holbrook used his official Village e-mail account, sent the e-mail to firefighters he supervised, and signed it "Fire Chief." Second, the e-mail warned the employees that they "could potentially be out of a

---

[5] Unfortunately, there is little evidence directly from Dumas explaining her motivations. She did not file an affidavit and was not deposed. When the extant record materials are viewed as a whole, however, they clearly indicate that the July 26 e-mail was the trigger. This understanding is corroborated by the fact that the parties' briefing below focused almost exclusively on it. And our review of the district court's ruling is properly confined to the record made below.

job." Third, in his letter to Mayor Mitchell, Holbrook explained that his job required him to "play both Fireman and Chief to my employees" and that he sent the e-mail to employees because he felt it was their right to know about the potential for losing their jobs, recognizing that they had families to support and it could be difficult to find another job quickly. Additionally, Holbrook expressly conceded in his deposition that he sent the information to employees in his "role as fire chief." R. 19-1, Holbrook Dep. at 44–45, Page ID 124.

In concluding that Holbrook communicated pursuant to his official duties, not as a citizen, the district court distinguished *Lane v. Franks.* In *Lane*, an employee testified pursuant to subpoena in a criminal prosecution about matters he learned of in the course of his employment. The Court concluded his testimony was speech "as a citizen" even though it concerned his duties as an employee because the speech was not ordinarily within the scope of his duties. *Lane*, 134 S. Ct. at 2379. The district court explained its reasoning as follows:

> The critical question ". . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane*, 134 S.Ct. at 2379. Here there is no dispute that Holbrook learned about the insurance situation as a result of his position as Fire Chief. But the determinative question is not **how** he learned the information, but what he said, where and how he said it, and when he spoke about that information. His own words in the email demonstrate that he communicated the information to his firemen because he was their chief, and he felt he had an obligation to inform them of the situation and that they could be without a job in the near future.

R. 29, Order at 14, Page ID 321 (emphasis in original).

The district court also distinguished *Westmoreland v. Sutherland*, 662 F.3d 714 (6th Cir. 2011), where an employee who was off duty and not in uniform spoke during a public comment period at a city council meeting. Finding nothing in the record supporting the claim that he spoke pursuant to his official duties, the court held that he spoke as a citizen. *Id.*, 662 F.3d at 719. Here, in contrast, as the district court noted, the factual record is quite different. The

instant record is replete with evidence that Holbrook sent the July 26 e-mail in his role as Fire Chief, not simply as a concerned citizen. If, instead of sending the e-mail to his employees from his official e-mail account because he felt duty-bound to do so as Fire Chief, "Holbrook had appeared at the [Village] Council meeting, off duty and not in uniform, and publicly commented about ramifications on his department of a potential loss of insurance coverage," the district court noted, the question would have been closer. R. 29, Order at 11–12, Page ID 318–19.

Holbrook insists the district court's conclusion is in error. He attacks it on several fronts, all unsuccessfully. First, he contends the e-mail message informed employees about the impending cancellation of the Village's liability insurance, a subject not ordinarily within the scope of the Fire Chief's duties. He concedes that the potential loss of the employees' jobs was a concern, but argues this was a by-product of the loss of insurance. Inasmuch as the cancellation of insurance was precipitated, he contends, by Dumas's style of management—because it "spawned a large number of actions" against the Village—the e-mail is said not to be addressed only to intra-departmental personnel issues. The district court addressed this argument and, considering the "content, form and context" of the e-mail, concluded Holbrook was speaking as Fire Chief to his employees on a personnel issue. R. 29, Order at 14–15, Page ID 321–22. Citing *Garcetti*, 547 U.S. at 423–24, the court held such communication was not protected and that Dumas therefore had the right to take corrective action if she believed the communication was inflammatory or misguided. *Id.*

In this we find no error. Holbrook's attempt to recast the purpose of the e-mail is understandable, but is simply not supported by the record. Yes, the notice of insurance cancellation was attached and was referred to in the body of the message, but the purpose of the e-mail is evident in the text of the message. Holbrook, as Fire Chief, wanted to alert his

employees as soon as possible to a development he just learned about that potentially jeopardized their employment. He urged them to attend the upcoming Village Council meeting—ostensibly to show their concern about their jobs and to witness how the Council responded to the challenge posed by the notice of insurance cancellation. That this evident purpose was the *actual* purpose of the communication finds manifold confirmation in the record, from Holbrook himself. From the outset—in his written answers to Dumas, in his letter to Mayor Mitchell, in his deposition testimony, and in his affidavit—Holbrook consistently explained and defended his actions by emphasizing employees' right to know about this threat to their continued employment, for their benefit. See R. 19-1 Ex. B, Holbrook's Answers No. 5, Page ID 137; R. 19-1 Ex. C, Letter to Mayor, Page ID 139; R. 19-1, Holbrook Dep. at 37–38, Page ID 121–22; R. 22-8, Holbrook Aff. at ¶ 5, Page ID 235–36. Neither the text of the e-mail message nor the factual record as a whole supports Holbrook's present characterization of the e-mail's purpose as reflecting a citizen's concern about mismanagement in Village government.

Among the factors we consider in determining whether an employee's speech was made pursuant to his official duties rather than as a citizen are the ordinary scope of the employee's duties, the impetus for the speech, the setting, the audience, and the subject matter of the speech. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012); *Weisbarth*, 499 F.3d at 546. All of these factors support the district court's conclusion. Holbrook sent the e-mail as Fire Chief, from his official e-mail account, to fire department employees, informing them of a development potentially affecting their employment, out of a sense of duty to them and concern for their well-being. In all these respects, the factual record is undisputed.

Holbrook contends that his having sent the e-mail from his official account does not necessarily disqualify the communication from First Amendment protection. Indeed, not "all

speech within the office is exposed to restriction" by the employer. *Garcetti*, 547 U.S. at 421. That Holbrook used the Village e-mail account to communicate is not dispositive. What is important is that he communicated, as he conceded, with fire department employees in furtherance of his responsibilities as Fire Chief. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22.

But Holbrook maintains he did not share the information *because* he was Fire Chief, but because the employees had the right to know. This after-the-fact "clarification" is hardly persuasive. To the extent Holbrook means to suggest he communicated merely as a concerned friend or citizen, not as Fire Chief, the clarification is directly contradicted by the fact that he signed the e-mail as "Fire Chief," and by Holbrook's explicit admissions in his letter to Mayor Mitchell, R.19-1 Ex. C, Page ID 139, and in his deposition testimony, R. 19, Holbrook Dep. at 37–38, 44–45, Page ID 124. Holbrook cannot now substantiate his claim of error simply by contradicting, in legal argument, his previous statements in the factual record that formed the basis for the district court's ruling. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908–09 (6th Cir. 2006) (holding that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his previous sworn statement).

Moreover, Holbrook expressly recognized in his deposition testimony that the employees' "right to know," from him in particular, was a function of *his* obligation to tell them *as their Chief*. R. 19, Holbrook Dep. at 38, Page ID 123. Even if Holbrook was not specifically required by his job duties to send the July 26 e-mail, it is clear that the communication "owed it existence" to his responsibilities as Fire Chief. This is enough to render it speech "pursuant to his duties" as a public employee and not speech "as a citizen." *See Garcetti*, 547 U.S. at 421–22;

*Alomari v. Ohio Dep't of Public Safety*, 626 F.App'x 558, 567–68 (6th Cir. 2015); *Keeling v. Coffee Cty, Tenn.*, 541 F.App'x 522, 528 (6th Cir. 2013); *Weisbarth*, 499 F.3d at 544.

Accordingly, we find no error in the district court's holding that Holbrook communicated pursuant to his official duties and that his speech was therefore not protected.

**III**

It follows that Holbrook's termination, insofar as it was motivated by his speech, did not impermissibly abridge his freedom of speech and summary judgment was properly awarded to Dumas. This result obviates the need to reach the alternative grounds for the district court's ruling—i.e., that Holbrook was not commenting on a matter of public concern; that even if his speech were protected, discipline was justified by the Village Manager's interest in promoting morale and efficiency among Village employees; and that even if Holbrook's freedom of speech were impermissibly abridged, Dumas is entitled to qualified immunity.

In upholding the district court's ruling, we express no opinion on the wisdom or appropriateness of Holbrook's firing. Rather, we recognize that "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." *Connick*, 134 U.S. at 147. Echoing *Connick*, we rule only that "[t]he limited First Amendment interest involved here does not require that [Dumas] tolerate actions which [she] reasonably believed would disrupt the office, undermine [her] authority, and destroy close working relationships." *Connick*, 461 U.S. at 154. To the extent her response to Holbrook's communication seems harsh, we note that the law provides other protections to employees and other checks on supervisors who would abuse their authority. *See Garcetti*, 547 U.S. at 425–26. The district court correctly concluded that the First

Amendment interests presented in this case are not such as to warrant relief in the form of federal court intervention in the management of the Village of Lincoln Heights Fire Department.

Judgment **AFFIRMED**.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority narrows in on Jonah Holbrook's email at the expense of two other crucial acts of expression: Holbrook's Facebook post and Holbrook's conversation with Matt Flager. Because we must look at every act of expression in our analysis of a First Amendment retaliation claim—not just the act of expression we may deem the most important—I would consider both Holbrook's Facebook post and Holbrook's conversation with Flager. Accordingly, I dissent.

## I. BACKGROUND

It is important to begin by discussing additional facts and clarifying the chronology. At the July 25 meeting, Stephanie Dumas, the Village Manager, told Fire Chief Holbrook that she had received a letter from the Village's insurance provider stating that it was terminating the Village's insurance, effective October 2. R. 22-1 (Insurance Letter at 1–2) (Page ID #213–14). Dumas confessed to Holbrook that she did not think that the Village would be able to obtain replacement coverage in such a short period of time given that the Village had nine lawsuits pending against it. R. 19-1 (Ex. A, Holbrook Dep. at 34) (Page ID #122); R. 22-5 (Letter to Mayor at 1) (Page ID #229). According to Holbrook, Dumas then told Holbrook that if the Village could not find replacement coverage, it would not be able to operate its Fire Department, and the Fire Department's firefighters and other employees would lose their jobs. R. 19-1 (Ex. A, Holbrook Dep. at 34) (Page ID #122). Dumas, of course, denies saying that the Village might be forced to close the Fire Department. R. 20-1 (Def. Resp. to Pl. Req. for Admissions ¶ 6) (Page ID #162). But Holbrook maintains that Dumas told him that the Village would not be able to operate its Fire Department if it did not find replacement coverage, and that Dumas seemed genuinely concerned about the possibility of obtaining this coverage in light of the pending

lawsuits, even asking, "who else would insure us?" R. 19-1 (Ex. A, Holbrook Dep. at 34) (Page ID #122).

At the Village Council meeting the following Monday, Dumas informed Village residents that the Village needed to find new insurance. R. 19-1 (Ex. D, Council Meeting Mins. at 3) (Page ID #142). The majority notes that the minutes from this meeting "do not reflect that any controversy ensued." Maj. Op. at 3. This is true. But this may be because what the minutes do reflect is that Dumas dodged the issue. Dumas addressed the insurance letter only at the request of another attendee, and the extent of her comments were that the Village's "insurance *may*[ ]be terminated." R. 19-1 (Ex. D, Council Meeting Mins. at 3) (Page ID #142) (emphasis added).

These facts give us an idea of how the situation may have looked to Holbrook: Dumas told Holbrook that the Village was losing its insurance coverage, that she did not think the Village will be able to find replacement coverage, and, if this happened, that the Village would have to close its Fire Department. Dumas then gave Village residents a sanitized version of what she told Holbrook. Holbrook may have felt like the onus was on him to warn Village residents about what could happen. Of course, it is possible that Holbrook's version of events is exaggerated. But this context demonstrates that the majority too easily adopts Dumas's characterization of Holbrook's email as "alarmist." Maj. Op. at 8, 10.

It is also important to review the order in which the events unfolded. Dumas and Holbrook's initial meeting was on Friday, July 25. R. 19-1 (Ex. A, Holbrook Dep. at 34) (Page ID #122); *see also* R. 22-2 (Emails at 1–2) (Page ID #215-16). After the meeting, Dumas emailed Holbrook a copy of the insurance letter. R. 22-2 (Emails at 1–2) (Page ID #215-16). Holbrook forwarded Dumas's email the next day, on Saturday, July 26. *Id.* at 1 (Page ID #215). In the body of his email, Holbrook asked the recipients to go to the Village Council meeting on

Monday. *Id.* On July 30, the Wednesday after the Village Council meeting—where again, all that Dumas said was that the Village's "insurance *may*[ ]be terminated," R. 19-1 (Ex. D, Council Meeting Minutes at 3) (Page ID #142) (emphasis added)—Holbrook posted on Facebook that the Village's Fire Department was "in jeopardy," R. 19-1 (Ex. B, Questionnaire Resp. at 1) (Page ID #137). Around this same time, Holbrook discussed the issue with his friend, Flager. R. 22-8 (Holbrook Aff. ¶ 13) (Page ID #237).

On August 5, less than a week later, Dumas called Holbrook into her office and asked him if he had forwarded the insurance letter that she had emailed him on July 25. *Id.* ¶ 7 (Page ID #236). When Holbrook admitted that he had, Dumas told him that she would send him a written questionnaire and that she would ask for his resignation once she received his answers. *Id.* Dumas sent the questionnaire on August 7, R. 19-1 (Ex. B, Questionnaire Resp. at 1) (Page ID #137), and Holbrook sent his responses on August 8, R. 22-8 (Holbrook Aff. ¶ 8) (Page ID #236). Holbrook then wrote a letter to the Village's Mayor, lodging a complaint against Dumas. R. 22-5 (Letter to Mayor at 1–2) (Page ID #229–230).

On August 12, Holbrook received a letter from Dumas, informing him that he was suspended with pay effective August 11. R. 22-8 (Holbrook Aff. ¶ 10) (Page ID #236). That same day, Holbrook and Dumas arranged to meet on August 15. *Id.* However, Dumas called Holbrook on August 15 to cancel their meeting and inform Holbrook that he was terminated. *Id.* ¶ 11 (Page ID #236–37). Dumas followed up with a letter confirming Holbrook's termination on August 26, which outlined the reasons for his termination. Three of these reasons concerned Holbrook's discussions about the potential ramifications of the Village losing its insurance coverage:

> [Holbrook's] [t]ext [message] to Fire Department personnel informing them they would not have a job effective October 2, 2014.

> [Holbrook's] [p]ost on Facebook indicating Fire Department personnel would not have a job as of October 2, 2014.
>
> [Holbrook's] [d]iscussion with Chief of Wyoming Fire Department indicating the Fire Department would not exist after October 2, 2014.[1]

R. 22-7 (Termination Letter at 1) (Page ID #233). The letter does not mention Holbrook's email (although the text message to the Fire Department's employees told them that they could lose their jobs and then instructed them to wait for an email).[2]  *Id.*; *see also* R. 19-1 (Ex. B, Questionnaire Resp. at 1) (Page ID #137).

## II.  CONTROLLING TEST

This court applies a burden-shifting framework to determine whether a public-employee plaintiff has proven a claim of retaliation in violation of the First Amendment. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). First, the plaintiff must establish a prima facie case of retaliation by showing that

> (1) [the plaintiff] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [the plaintiff] that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [the plaintiff's] protected conduct.

*Id*. (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). If the plaintiff establishes a prima facie case of retaliation, "the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Id.* (quoting *Dye*, 702 F.3d at 294). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.*

---

[1] As the majority observes, this is an error; Holbrook's conversation was with Flager, the Assistant Fire Chief for the Wyoming Fire Department.  R. 22-8 (Holbrook Aff. ¶ 13) (Page ID #237).

[2] Holbrook does not argue that the text message is protected speech and therefore has waived this argument on appeal.

(quoting *Dye*, 702 F.3d at 294–95). In this case, only the first element of Holbrook's prima facie case—whether Holbrook's speech was constitutionally protected—is contested. Dumas does not dispute the second and third elements of Holbrook's prima facie case nor does she argue that the employment decision would have been the same absent the protected conduct.

### III. HOLBROOK'S FACEBOOK POST AND HOLBROOK'S CONVERSATION WITH FLAGER

In previous First Amendment retaliation cases involving multiple acts of expression, we have analyzed each act of expression individually. *See, e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 811–12 (6th Cir. 2001). In doing so, we have recognized that "[i]t is implicit in *Connick* [*v. Myers*, 461 U.S. 138, 149 (1983),] that the court must examine *each* activity which the employee claims provided the actual motivation for his termination to see whether it touches upon a matter of public concern." *Id.* (internal alterations omitted) (quoting *Johnson v. Lincoln Univ. of Com. Sys. of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985)). The majority, however, fails to consider two of the activities that Holbrook claims provided the actual motivation for his termination: Holbrook's Facebook post and Holbrook's conversation with Flager.

Holbrook raised both activities before the district court. Holbrook's complaint very clearly addresses his Facebook post. After discussing Holbrook's email to Fire Department employees, the complaint states that, "Holbrook *posted a notice on his personal Facebook Page to the same effect.*" R. 1 (Compl. ¶ 11) (Page ID #3) (emphasis added). The complaint then details how "Dumas wrote to Holbrook, explaining the grounds for his termination," citing "his discussions by email, on *Facebook*, and with others." *Id.* ¶ 16 (Page ID #3) (emphasis added). Holbrook's complaint then alleges that "Dumas, *through the actions set forth above*, has retaliated against Holbrook for speaking about the possible inability of the Village to find insurance coverage for the Fire Department." *Id.* ¶ 18 (Page ID #3) (emphasis added).

Holbrook copied and pasted the text of his Facebook post (including a comment he made on the post) into his answers to Dumas's questionnaire, which is one of the exhibits attached to his deposition. R. 19-1 (Ex. B, Questionnaire Resp. at 1) (Page ID #137). Holbrook also addressed the Facebook post in his motion for summary judgment, in both the statement of facts, R. 22 (Holbrook Am. Mot. for Summ. J. ¶¶ 7, 15) (Page ID #204, 205–06) ("Holbrook posted on his Facebook Page the following message . . . "), and the argument section, *id.* at 8 (Page ID #208) ("Holbrook asserts that his emailing of the PEP letter to Fire Department employees, *and subsequent actions disseminating the contents of that letter*, constitute protected speech." (emphasis added)). That the district court not only acknowledged but also analyzed Holbrook's Facebook post in its opinion demonstrates that this issue was sufficiently raised and considered below. R. 29 (Dist. Ct. Op. at 3, 5, 10, 12, 15) (Page ID # 310, 312, 317, 319, 322).

Moreover, Holbrook's complaint states that Dumas's termination letter cited his "discussions . . . *with others*," and the termination letter, which lists the conversation Holbrook had with the "Chief of [the] Wyoming Fire Department," is attached to the complaint. R. 1 (Compl. ¶ 16) (Page ID #3) (emphasis added); R. 1-1 (Ex. C, Termination Letter at 1) (Page ID #10). Holbrook's motion for summary judgment explicitly refers to his discussion with Flager in the fact section, R. 22 (Holbrook Am. Mot. for Summ. J. ¶¶ 9, 15) (Page ID #204, 205–06) ("Holbrook also spoke with Matt Flager"), and argues that Holbrook's "emailing of the PEP letter to Fire Department employees, and *subsequent actions* disseminating the contents of that letter, constitute protected speech," *id.* at 8 (Page ID #208) (emphasis added). The district court mentioned Holbrook's conversation with Flager, R. 29 (Dist. Ct. Op. at 3) (Page ID #310), but did not analyze it as protected speech. Given Holbrook's discussion of the conversation in his summary judgment motion, however, it is not waived.

No valid reason exists for refusing to consider these two acts of expression. This is not to say that the majority does not offer up a reason for its decision; indeed, it offers up many. But none of these reasons finds any support in the law. For example, one of the reasons the majority gives for its decision is that the parties' briefs focus "*primarily*" on Holbrook's email (a qualifier the majority has to insert because the parties' briefs discuss the other acts of expression, too). *See* Maj. Op. at 8. But the majority does not cite any case holding that our consideration of First Amendment retaliation claims is necessarily limited to what, in our view, the parties have focused on.

Another reason the majority gives is that Holbrook's email is what "provoked Dumas" and what "triggered Dumas's ire." *Id.* at 8, 9. As a preliminary point, nothing in the record supports the assertion that the email "provoked Dumas" or "triggered [her] ire." *See id.* These colorful characterizations are the majority's alone. However, I will assume that the majority recognizes that "ire" has no legal import in the context of First Amendment retaliation claims and that what the majority is really getting at is causation: that it was Holbrook's email that led to his termination, and that Holbrook's Facebook post and Holbrook's conversation with Flager are irrelevant.

As explained above, only the first element of Holbrook's prima facie case—whether his speech was constitutionally protected—is contested. In looking at this element, "the court must examine *each activity* which the employee claims provided the actual motivation for his termination to see whether it touches upon a matter of public concern." *Bonnell*, 241 F.3d at 811–12 (emphasis added) (internal alterations omitted) (quoting *Johnson*, 776 F.2d at 451). The question of causation—as the majority has framed it—cannot possibly be a part of the court's analysis here, because Dumas does not dispute the second and third elements of Holbrook's

prima facie case or even argue that the employment decision would have been the same absent the protected conduct. The majority's refusal to consider these two acts of expression, therefore, is wholly improper.

Of course, if Holbrook asked us to consider acts of expression that could not have possibly led to his termination, that would be different. For example, if Dumas fired Holbrook immediately after he forwarded her email and then Holbrook contended that a subsequent Facebook post or conversation also formed the basis of his termination, we would of course reject that argument. But that is not what happened here. Holbrook forwarded Dumas's email, posted on Facebook, spoke with Flager, and *then* was terminated. What is more, the letter confirming his termination lists his Facebook post and his conversation with Flager *as reasons for the termination*.

For all these reasons, I respectfully dissent.